UNTED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IDG USA, LLC,                                              **COMPLAINT**

                                        Plaintiff,

vs.

KEVIN J. SCHUPP,
                                                          Case No. _____

                                        Defendant.

---

        Plaintiff IDG USA, LLC ("IDG"), by its attorneys, Phillips Lytle LLP, for its

complaint against defendant Kevin J. Schupp ("Schupp"), alleges, upon information and belief,

as follows:

## PARTIES

        1.      Plaintiff IDG is a Georgia limited liability company with its principal

place of business located in Belmont, North Carolina, which transacts business in this

jurisdiction at 405 North French Road, Amherst, New York 14228 ("Amherst Office").

        2.      Defendant Schupp is a former sales associate and employee of IDG at its

Amherst Office and is a citizen and resident of the State of New York, with an address at 12

West Home Road, Bowmansville, New York 14026.

## JURISDICTION AND VENUE

        3.      This Court has subject matter jurisdiction of this action by virtue of

diversity of citizenship, 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum of

$75,000.00, exclusive of interest and costs, and is between citizens of different states.

        4.      Plaintiff seeks immediate injunctive relief pursuant to Fed. R. Civ. P. 65.

5.      Venue is proper pursuant to 28 U.S.C. § 1391 because Schupp resides within this District and, in the alternative, because a substantial part of the events and omissions giving rise to the claims in this action occurred in the District.

## NATURE OF IDG'S BUSINESS

6.      IDG is an acronym for "Industrial Distribution Group."  IDG is a national distributor of industrial materials and assists businesses with designing, building and executing supply chain solutions for industrial materials.

7.      As a national distributor, IDG supplies its clients with various brands of supplies, including, without limitation, abrasives, brushes, chemicals, lubricants and adhesives, cutting tools, dispensing solutions, electrical supplies, fasteners, fluid power supplies, hand tools, janitorial supplies, material handling equipment, maintenance equipment and supplies, office supplies, power tools, power transmission supplies, pumps, quality control supplies, safety supplies, saw blades and tapes.

8.      With its supply chain solutions, IDG designs and implements plans which provide clients with access to state-of-the-art product and reduce clients' costs by more effectively tracking costs associated with these products.

9.      IDG's Amherst Office is responsible for growing and maintaining IDG's customer base in Upstate New York and Western Pennsylvania, including Pittsburgh (the "Area").

10.      IDG's sales associates are responsible for the growth and maintenance of IDG's approximately 500 customer accounts in the Area.

11.     Since the Amherst Office employs relatively few sales associates to cover such a large geographic area (just 2 since Schupp resigned), its sales associates service IDG's major revenue generating clients.

### IDG'S RELATIONSHIP WITH DEFENDANT SCHUPP

12.     In 1998, IDG acquired a local cutting tool operation named Austin Ford Logan, Inc. ("Austin").  As part of the acquisition, IDG acquired, among other things, Austin's good will, including, without limitation, its customer accounts.

13.     IDG retained most of Austin's employees, including Schupp, who immediately began employment with IDG as a sales associate.

14.     Schupp thereafter serviced many of IDG's major clients in the Area.

15.     On May 27, 2008, Schupp executed a Non-Compete Agreement ("Agreement") which clearly set forth Schupp's obligations to IDG in the event that Schupp's employment with IDG ended.  A true and accurate copy of the Agreement is attached as Exhibit A.

16.     In the Agreement, Schupp acknowledged, without limitation, that, by virtue of his employment as a key IDG employee:  he enjoyed a position of special trust and confidence with IDG; had access to confidential information that IDG compiled and maintained about its customers; **was informed of the long-standing relationship between IDG and its customers and familiarized with the special requirements of various IDG customers**; would become familiar with special sales and marketing techniques used by IDG which are extremely valuable to IDG and not generally known; would be advised of various aspects of IDG's profit structure on goods and services it provided; and would be **"given the direct assistance and sponsorship of the executive, technical, and sales management personnel employed by**

- 3 -

**[IDG] in maintaining and reinforcing relationships between [IDG] and its customers**." (Ex. A, ¶ 6.) (Emphasis added.)

17.     Schupp agreed that, if he was permitted, after cessation of his employment with IDG, to trade upon the training and confidential information which he received by virtue of his position of trust and confidence with IDG and "upon the special relationships which he has established and maintained with the sponsorship of [IDG], irreparable damage will result to IDG." (Ex. A, ¶ 6.)

18.     Schupp therefore covenanted that after his employment with IDG ended, whether by him or IDG, he would not directly or indirectly:

    i.     For a period of twelve (12) months from the date of his termination (or as otherwise provided in subparagraph (e) below), in any way within a radius of fifty (50) miles of the place of business of the Company in which SCHUPP is assigned or has been assigned at any time within the period of twelve (12) months immediately preceding the date of his termination, accept employment from, or engage in any activities whatever in behalf of, or become affiliated or connected in any way with, any business which is competitive with the business of the Company (as described in paragraph (5) above or as it may be constituted at the date of the termination of the employment of SCHUPP) if SCHUPP will be required or expected to perform any services or engage in any activities which are substantially similar to the services performed or activities engaged in by SCHUPP during the period of his employment by the Company; nor;

    ii.     For a period of twelve (12) months from the date of his termination (or as otherwise provided in subparagraph (e) below) solicit competitive orders or patronage on behalf of any business which is competitive with the business of the Company (as described in paragraph (5) above or as it may be constituted at the date of the termination of the employment of SCHUPP) from any customer of the Company which has been assigned by the Company to SCHUPP or with which SCHUPP has had any contact during the period of his employment by the Company; and for the purpose of this paragraph (7), "customer of the Company" shall be defined as any person, firm or corporation, wherever located, which within twelve (12) months immediately preceding the termination of the employment of SCHUPP has purchased services or goods from the Company having a total cost greater than Twenty-Five Thousand Dollars ($25,000.00); nor;

      iii.    During the period of his employment with the Company under this Agreement and at all times after the date of his termination disclose to any person, firm, or corporation (except as expressly authorized in writing by the Company) the sales and marketing techniques of the Company; the name of any customer of the Company (as defined in subparagraph (b) above; the Company's pricing policy with respect to any such customer; the Company's sales volume to any such customer; the profit structure on services and goods handled by the Company; the identity of or any information relating to any design, improvement, or invention of the Company (whether or not developed by SCHUPP); any supplier of the Company; the quality control techniques of the Company; any "trade secret" of the Company; or any other confidential information or material relating to the Company, its services or goods, customers, suppliers, employees, or the operation of its business which has been obtained by him during or as a result of his employment by the Company.

(Ex. A, ¶ 7(a), (b), (d), respectively.)

19.    Schupp agreed that the twelve month period for the non-competition covenants set forth in paragraphs 7(a) and 7(b) of the Agreement would run from the date a court issued an injunction restraining Schupp from further breach of these covenants if IDG obtained such an injunction.  (Ex. A, ¶ 7(e).)

20.    In addition, Schupp agreed that "any breach of the [non-competition and non-solicitation] covenants by Schupp would not be readily or appropriately compensable in damages, and expressly agree[d] that in addition to all other available remedies at law or in equity, each covenant by Schupp shall be enforceable by injunctive relief."  (Ex. A, ¶ 7(e).)

21.    Schupp also agreed that the "non-competition and non-disclosure covenants are reasonable and necessary to protect the interests of [IDG] and its business and that [Schupp's] previous employment experience is readily adaptable to different businesses and to different products, so that the enforcement of [those covenants] against him would not prevent him from effecting a satisfactory utilization of his skills and a satisfactory realization of his potentials."  (Ex. A, ¶ 7.)

22.     As consideration for executing the Agreement, IDG offered continued employment to Schupp and paid Schupp an additional $3,000.00.

23.     Schupp also executed a Confidentiality Agreement on December 3, 2009 ("Confidentiality Agreement"), a true and correct copy of which is attached as Exhibit B.

24.     Pursuant to the Confidentiality Agreement, Schupp agreed that, after the end of his employment with IDG, he would hold in the "strictest confidence" and not use, except for the benefit of IDG, any of IDG's trade secrets.  (Ex. B.)

25.     Schupp further agreed that after his termination date, he would hold in the "strictest confidence," and not use any of IDG's "Confidential Information" for two (2) years after his termination date, except for the benefit of IDG.  (Ex. B.)

26.     The Confidentiality Agreement defined "Confidential Information" as "any information, without regard to form, relating to [IDG's] customers, operation, finances, and business that derives economic value, actual or potential, from not being generally known to other Persons, including, but not limited to, technical or non-technical data, formulas, patterns, compilations (including compilations of customer information), programs, devices, methods, techniques, processes, financial data or lists of actual or potential customers, suppliers and vendors (including identifying information about customers, suppliers and vendors), whether or not in writing . . . ."  (Ex. B.)

27.     Indeed, Schupp also twice agreed to abide by IDG's Code of Business Ethics, which prohibited Schupp from using IDG's confidential information he acquired through his employment for "personal advantage" at any time.  True and correct copies of the October 29, 2003 and December 3, 2009 IDG Code of Business Ethics are attached as Exhibits C and D, respectively.

28.     Because Schupp executed the Confidentiality Agreement and agreed to IDG's Code of Business Ethics, IDG continued to provide Schupp with its confidential information and/or trade secrets and continued his employment relationship.

29.     Throughout his employment with IDG, IDG provided Schupp with access to confidential information, as evidenced by, for instance, the Receipt of Confidential Documents Form Schupp executed on April 22, 2002, a true and correct copy of which is attached as Exhibit E.

30.     Through its preexisting relationships with its customers, IDG assigned Schupp most, if not all of the customers, he serviced for IDG during his employment.

31.     The major customers IDG assigned Schupp to service while he was at IDG included at least 13 customers whose purchases exceeded the amount of $25,000 in the twelve months prior to Schupp's termination.

32.     IDG assigned Schupp to these customers based on a combination of the customer's needs and Schupp's experience and knowledge.

33.     Schupp, like other sales associates in the Amherst Office, was given significant leeway in incurring travel, entertainment and other expenses to develop and maintain IDG's good will with its current and prospective employees.

34.     IDG fully reimbursed Schupp for such expenses, as it fully encouraged such expenditures for building and maintaining its good will with its customers.

35.     IDG incurred substantial expense funding Schupp's costs to build IDG's good will its clients, as IDG reimbursed Schupp for over $52,000.00 in business development and entertainment expenses from 2006 to 2009 – $6,937.70 in 2006, $12,159.53 in 2007, $21,087.96 in 2008 and $12,240.98 in 2009.

36.     In addition, IDG paid all of Schupp's transportation expenses, providing a company car and a company fuel credit card.

37.     By way of example, copies of Expense Reports Schupp submitted for reimbursement from December 2007 to June 2008 are attached as Exhibit F.

**SCHUPP VOLUNTARILY RESIGNS FROM IDG, ACCEPTS A SIMILAR POSITION WITH IDG'S DIRECT LOCAL COMPETITOR IN ITS BUFFALO OFFICE AND SOLICITS IDG'S CUSTOMERS IN CONTRAVENTION OF THE AGREEMENT**

38.     On January 14, 2010, Schupp voluntarily terminated his employment with IDG without any forewarning or advanced notice.

39.     Before Schupp resigned, his supervisor, Thomas Lewis cautioned Schupp about his post employment non-competition obligations.

40.     Mr. Lewis further cautioned Schupp that IDG would seek to enforce Schupp's non-competition obligations if he violated them.

41.     Within a matter of days after Schupp's voluntary resignation, and Mr. Lewis' warning, however, Schupp began employment as a sales representative with Abrasive-Tool Corp. ("Abrasive"), a direct competitor of IDG.

42.     Abrasive directly competes with IDG in both sales and program design, the two major services IDG offers.

43.     Abrasive sells many of the same products as IDG, including, without limitation, abrasives, cutting tools, fasteners, metals, plastics, fluids, lubricants, hand tools, machines and accessories, material handling equipment, power tools, precision tools, safety supplies, shop supplies, janitorial supplies, and tooling components.

44.     Abrasive also offers tooling solutions services, which are very similar to IDG's supply chain solutions.

45.     Although Abrasive has offices in both Rochester and Syracuse, Schupp now works out of Abrasive's Buffalo office, which is less than ten (10) miles away from IDG's Amherst Office.

46.     Based on the foregoing, Schupp is engaging in work for IDG's direct competitor which is substantially similar to the work Schupp performed for IDG, within twelve months after his voluntary resignation from IDG, well within fifty (50) miles from IDG's Amherst Office out of which Schupp worked, in direct violation of the Agreement.

47.     Schupp's behavior in this respect is a clear and unequivocal breach of the Agreement.  (Ex. A, ¶ 7(a).)

48.     Schupp has also solicited competitive orders on behalf of Abrasive from IDG clients, to whom Schupp was assigned during his employment with IDG, who purchased goods and services from IDG in excess of $25,000.00 during the twelve months preceding Schupp's voluntary resignation.

49.     IDG sales representative Robert Carbone saw Schupp at one of the customers identified in paragraph 31.  IDG assigned Schupp to service this customer during his employment with IDG; and additionally, reimbursed Schupp for his business expenses for client development, travel and entertainment during to develop and maintain IDG's good will with this customer.  This customer purchased goods and services from IDG well in excess of $500,000 in 2009.

50.     Schupp has also contacted a second customer identified in paragraph 31 and quoted prices for Abrasives goods and services.  IDG assigned Schupp to service this customer during his employment with IDG; and reimbursed Schupp for his business expenses for client development, travel and entertainment to develop and maintain IDG's good will with this

customer.  This is a major IDG customer, having purchased goods and services from IDG in excess of $147,438.00 in 2009.

51.     Schupp also met with a third IDG customer identified in paragraph 31, who shortly thereafter informed IDG that it would be looking for better prices than those offered by IDG in the future.  IDG assigned this customer to Schupp during his employment with IDG; and reimbursed Schupp for his in business expenses for client development, travel and entertainment to develop and maintain IDG's good will with this customer.  This is also a major IDG customer, having purchased goods and services from IDG in excess of $63,297.00 in 2009.

52.     Based on the foregoing, it is clear that Schupp's above-referenced contacts with the above-named IDG customers and other IDG customers not specifically named herein breached the Agreement.  (Ex. A, ¶ 7(b).)

53.     Schupp has also disclosed IDG's confidential information in breach of the Agreement.

54.     Schupp recently contacted a fourth IDG customer identified in paragraph 31 and relayed IDG's confidential information regarding IDG's Amherst Office's control over pricing issues.

55.     Schupp's behavior in this respect is a clear breach of Schupp's promise not to disclose IDG's confidential information to anyone after separation from employment with IDG.

56.     The IDG customers being contacted by Schupp are repeat and long standing IDG customers.

57.     Upon information and belief, Schupp continues to use and/or disclose his knowledge about IDG's pricing policies from his employment with IDG to undercut IDG's quotes for parts and services IDG provides to its customers.

58.     As a direct result of Schupp's above conduct, IDG has already lost, customers and, if Schupp is not enjoined, will continue to lose repeat and long standing customers; and further has been forced to reduce its prices to retain clients who Schupp has improperly contacted and solicited.

59.     IDG has suffered economic loss, which is unascertainable at this time, and will suffer future economic loss, which is presently incalculable.

60.     Also, IDG's goodwill with its clients has been irreparably damaged and continues to be irreparably damaged by Schupp's behavior.

61.     Schupp's contact and solicitation of IDG clients on behalf of Abrasive, his employment in Abrasive's Buffalo office as a sales representative, and his improper disclosure of IDG's confidential information, all in blatant contravention of the above-referenced agreements, have irreparably harmed IDG and will continue to irreparably harm IDG if Schupp is not restrained and enjoined from continued breaches of these agreements.

62.     As a result of the foregoing, IDG has demonstrated a likelihood of success on the merits, irreparable harm and that a balancing of the equities favors the issuance of an injunction against Schupp.

## FIRST CAUSE OF ACTION
(Breach of Covenant Not to Compete )

63.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 62 of this complaint.

64.     The Non-Compete Agreement is a binding contract between IDG and Schupp.

65.     Schupp is engaging in work for IDG's direct competitor which is substantially similar to the work Schupp performed for IDG, within twelve months after he voluntary resigned from IDG, well within fifty miles from IDG's Amherst Office out of which Schupp worked.

66.     Such behavior breaches Schupp's obligations under the non-compete provisions of the Agreement.  (Ex. A, ¶ 7(a).)

67.     Plaintiff substantially performed its obligations under the Agreement.

68.     The foregoing facts show that Schupp flagrantly breached his obligations under the Agreement and continues to do so.

69.     IDG has suffered, and will continue to suffer, damage to its business, reputation and goodwill as a result of Schupp's breach of the non-competition provision of the Agreement.

## SECOND CAUSE OF ACTION
(Breach of Covenant Not to Solicit )

70.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 69 of this complaint.

71.     Schupp has also solicited competitive orders on behalf of Abrasive from IDG clients, to whom Schupp was assigned during his employment with IDG, who purchased goods and services from IDG having a total cost of over $25,000.00 during the twelve months preceding Schupp's voluntary resignation.

72.     Such behavior breaches Schupp's obligations under the non-solicitation provisions of the Non-Compete Agreement.  (Ex. A, ¶ 7(b).)

- 12 -

73.     IDG has suffered, and will continue to suffer, damage to its business, reputation, and goodwill with its clients as a result of Schupp's breach of the non-solicitation provision of the Agreement.

### THIRD CAUSE OF ACTION
(Breach of Covenant Not to Disclose Confidential Information and Confidentiality Agreement)

74.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 73 of this complaint.

75.     Schupp disclosed IDG's confidential information and used IDG's confidential information in breach of the Agreement and Confidentiality Agreement.

76.     IDG has suffered, and will continue to suffer, damage to its business, reputation, and goodwill with its clients as a result of Schupp's breach of the non-solicitation provision of the Agreement and the Confidentiality Agreement.

### FOURTH CAUSE OF ACTION
(Unfair Competition )

77.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 76 of this complaint.

78.     Schupp has engaged, and continues to engage, in commercial activities which are intended to be in competition with IDG.

79.     Schupp, using IDG's proprietary information, has created an unfair commercial advantage in favor of himself and against IDG.

80.     IDG has suffered, and will continue to suffer, damage to its business, reputation, and goodwill with its customers as a result of such conduct by Schupp.

## FIFTH CAUSE OF ACTION
(Theft of Trade Secrets )

81.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 80 of this complaint.

82.     Schupp, while employed at IDG, obtained access to IDG's confidential information, including, without limitation, IDG's customer list, information about special requirements of IDG's customers and information about IDG's sales and marketing techniques.

83.     This information is extremely valuable to IDG and is not generally known to the public.

84.     IDG takes reasonable steps to keep this customer and business information secret and confidential.

85.     Schupp is wrongfully using and, upon information and belief, has misappropriated this information to target and solicit IDG's customers.

86.      IDG has suffered, and will continue to suffer, damage to its business, reputation, and goodwill with its customers as a result of such conduct by Schupp.

**WHEREFORE**, plaintiff IDG USA, LLC respectfully requests that the Court immediately issue a temporary restraining order, preliminary injunction and permanent injunction:

(i)     enjoining Schupp from engaging, directly or indirectly, in work which is substantially similar to Schupp's previous employment with IDG, for Abrasive, or any other competitor of IDG, within fifty miles of IDG's Amherst Office;

(ii)    enjoining Schupp from soliciting, directly or indirectly, competitive orders on behalf of Abrasive, or any other competitor of IDG, from IDG

customers to whom Schupp was assigned during his employment with IDG, who purchased goods and services from IDG having a total cost of over $25,000.00 during the twelve months preceding Schupp's voluntary resignation from IDG;

(iii)   enjoining Schupp from disclosing, directly or indirectly, IDG's confidential information and/or using IDG's confidential information;

(iv)   enjoining Schupp, directly or indirectly, from utilizing IDG's proprietary information to compete with IDG;

(v)   enjoining Schupp, directly or indirectly, from disclosing, using or destroying IDG's trade secrets; and

(vi)   granting IDG such other and further relief as the Court may deem just and proper.


DATED:      Buffalo, New York
            January 29, 2010


                    PHILLIPS LYTLE LLP


                    By _____/s/_____
                    Kevin J. English
                    Christopher L. Hayes
                    Attorneys for Plaintiff IDG USA, LLC
                    Suite 3400
                    One HSBC Center
                    Buffalo, New York  14203-2887
                    Telephone No. (716) 847-8400
                    kenglish@phillipslytle.com
                    chayes@phillipslytle.com

Doc # 01-2348063.3