UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IDG USA, LLC,

                Plaintiff

     v.

KEVIN J. SCHUPP

             Defendant.

**DECISION AND ORDER**
10-CV-76S

## I. INTRODUCTION

Plaintiff IDG USA, LLC ("IDG"), a Georgia company with its principal place of business in North Carolina, commenced this action on January 29, 2010, against its former employee, Defendant Kevin J. Schupp, a New York resident, alleging breaches of a Non-Compete Agreement, breach of a Confidentiality Agreement, unfair competition, and theft of trade secrets. (Docket No. 1, Compl.)

Currently before the Court is IDG's Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction, seeking to enjoin Schupp from: (1) working for any competitor within 50 miles of IDG's Amherst, New York office, (2) soliciting orders from certain customers, and (3) disclosing or using confidential information and/or trade secrets. (Docket No. 2.) Schupp opposes IDG's Motion for injunctive relief and, in addition, has filed a Cross-Motion to Dismiss the Complaint pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure.  (Docket No. 18.)[1]

Both motions are fully briefed and the Court heard argument on April 5, 2010.  For the reasons discussed below, IDG's Motion is granted, and Schupp's Cross-Motion is denied.

## II.  BACKGROUND

### A.    Factual Allegations

The following facts are drawn from the Complaint and attachments thereto.

IDG is a national distributor and supplier of industrial materials.  (Docket No. 1, Compl. ¶ 6.)  It has a Northeast Division, with a principal office in York, Pennsylvania.  ( Ex. A.)  Within the Northeast Division, an office in Amherst, New York is responsible for growing and maintaining the company's customer base in upstate New York and western Pennsylvania.  (¶ 9, Ex. A.)

In 1998, IDG acquired Austin Ford Logan, Inc. ("AFL"), a tool cutting company.  (¶ 12.)  Plaintiff Kevin Schupp was employed by AFL at the time of its acquisition.  (¶ 13.)  IDG retained most of AFL's employees, including Schupp, and he immediately began

---

[1] In support of its motion, IDG filed the Affidavit of Thomas B. Lewis, sworn to February 1, 2010, with exhibits 1 through 8 (Docket Nos. 2-2 - 2-10), portions of which were filed under seal (Docket Nos. 9-12); a Memorandum of Law (Docket No. 2-11); a Witness and Exhibit List (Docket No. 2-12); a Reply Memorandum of Law in further support of its Motion and in opposition to Defendant's Motion to Dismiss (Docket No. 24); the Reply Affidavit of Charles A. Lingenfelter, sworn to March 15, 2010, with exhibits 9 and 10 (Docket No. 24–2); the Reply Affidavit of Thomas B. Lewis, sworn to March 15, 2010, with exhibits 11 and 12 (Docket No. 24–3); and a Supplemental Submission in further support of its Motion (Docket No. 28).

In support of his Cross-Motion and in Opposition to IDG's Motion, Plaintiff has filed the Affirmation of Linda H. Joseph, Esq., dated March 1, 2010, with exhibits A and B (Docket Nos. 18-3 - 18-5); a Memorandum of Law (Docket No. 20); the Affidavit of Kevin J. Schupp, sworn to February 8, 2010, with exhibits A and B (Docket No. 23); a Reply Memorandum of Law (Docket No. 25); the Reply Affidavit of Kevin J. Schupp, sworn to March 22, 2010 (Docket No. 26.); and a Supplemental Submission (Docket No. 30.)

working out of IDG's Amherst, New York office as a Sales Associate.  (¶¶ 9, 11, 13-14.)
He serviced many of IDG's major revenue generating clients. (¶¶ 11, 14.)  Most, if not all
of these clients were assigned to Schupp by IDG, which had preexisting relationships with
the clients.  (¶ 30.)

While employed at IDG's Amherst office, Schupp was given significant leeway in
incurring travel, entertainment, and other expenses to develop and maintain good will with
IDG clients.  (¶¶ 33-34.)  IDG fully reimbursed Schupp for such expenses and, in addition,
provided him with a company car and fuel credit card.  (¶¶ 34-36.)

During the course of his employment, Schupp signed various employment-related
documents.   On May 27, 2008, Schupp and Edward Gerber, IDG's Northeast Division
President, entered into a "Non-Compete Agreement" (the "NCA"), in York, Pennsylvania.
(¶ 15, Ex. A.)  The NCA sets forth various terms and conditions of Schupp's employment
in the position of Account Executive.  (Ex. A.)  Schupp received "additional compensation
in the amount of Three Thousand Dollars ($3,000) in consideration for his execution,
delivery, and performance of th[e] [NCA] (specifically including without limitation the non-
competition and non-disclosure covenants contained in this paragraph (7))."  (¶ 12, Ex. A
¶ 7.)   On December 3, 2009, Schupp executed a Confidentiality Agreement.  (Ex. B.)

On January 14, 2010, Schupp voluntarily terminated his employment without
advance notice.  (¶ 38.)  Before his departure, Schupp's supervisor, Thomas Lewis,
cautioned him about his non-competition obligations and informed him that IDG would seek
to enforce those obligations.  (¶¶ 39-40.)

Within days after his resignation, Schupp commenced employment as a sales
representative with Abrasive-Tool Corp. ("Abrasive").  (¶ 41.)  Abrasive sells many of the

same products as IDG and offers customers similar services.  (¶¶ 42-44.)  Schupp works

out of Abrasive's Buffalo office, which is within ten miles of IDG's Buffalo office.  (¶ 45.)

The NCA provides that for a twelve month period from the date of his termination, Schupp

will not accept employment from any competitor of IDG for the performance of work similar

to the work he performed for IDG within a fifty mile radius of any office to which he was

assigned during the twelve months prior to his termination.  (Ex. A ¶ 7(a).)

Schupp has solicited orders on behalf of Abrasive from long-standing, major

revenue producing clients he was assigned to service and entertain during his employment

with IDG.  (¶¶48-51, 56.)  In addition, Schupp relayed to an IDG customer confidential

information regarding its Amherst Office's control over pricing issues.  (¶ 54.)  IDG believes

Schupp is using and/or disclosing his knowledge of IDG pricing policies to solicit orders

from IDG customers on behalf of Abrasive.  (¶ 57.)

IDG claims that as a result of Schupp's actions, it has suffered an indeterminate

economic loss, and that its customer goodwill has been irreparably damaged.

**B.    Procedural History**

IDG's Complaint, filed on January 29, 2010, asserts five causes of action: (1) breach

of the NCA's non-competition provision (¶ 7(a)), (2) breach of the NCA's non-solicitation

provision (¶ 7(b)), (3) breach of the NCA's non-disclosure provision (¶ 7(d)) and of the

Confidentiality Agreement, (4) unfair competition, and (5) theft of trade secrets.  Four days

after filing the Complaint, IDG moved for a temporary restraining order and preliminary

injunction.

At a conference on February 8, 2010, the parties agreed to attempt to resolve the

matter and mediation ensued.  The matter was not resolved and the Court set a briefing

schedule for the motion on February 18, 2010.

On February 23, 2010, Defendant filed an Answer to Complaint and Counterclaim with appended exhibits. (Docket No. 16.) Thereafter, Defendant filed a Cross-Motion to Dismiss.

On April 5, 2010, the Court requested supplemental briefing in connection with Plaintiff's motion. Briefing on both motions is now complete.

## III. DISCUSSION

### A. Choice of Law

Plaintiff is a Georgia company, Defendant resides in New York, the NCA, executed in Pennsylvania, provides that "this Agreement shall be construed under the laws of the State of North Carolina," and, as best this Court can discern, the conduct underlying IDG's claims occurred in New York and Pennsylvania (*i.e.*, within the territory covered by IDG's Amherst, NY office). Nevertheless, both IDG and Schupp assume that New York law applies.

"[S]ince neither party has raised any choice of law issues, it can be said that they have consented to the application of the forum state's law." Mangual v. Pleas, No. 02 Civ. 8311, 2005 U.S. Dist. LEXIS 19785, at *6 n.1 (S.D.N.Y. Sept. 8, 2005); *see also*, Clarkson Co. Ltd. v. Shaheen, 660 F.2d 506, 512 n.4 (2d Cir. 1981) ("[N]one of the parties claimed the applicability of Canadian law or asserted that it differs from that of New York. Each seems to have assumed that New York law governs. Hence, the district court was not obligated to take judicial notice of Canadian law and correctly applied forum law."); Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 U.S. Dist. LEXIS 7475, at

*14 n.3 (S.D.N.Y. Apr. 27, 2005) ("[T]he parties have not raised choice of law issues. Instead, the parties' briefs assumed that New York State law applies. Where the parties so assume, the Court need not address choice of law *sua sponte*.").  This Court will proceed, at least with regard to the instant motions, based on the parties' consent to the application of New York State law.

## B.    Cross-Motion to Dismiss

Defendant moves for judgment on the pleadings, pursuant to Federal Rules of Civil Procedure 12(c).  This motion will be addressed first because, if granted, IDG's motion will be rendered moot.

Schupp bases his motion on the "pleadings and the documents attached to the pleadings," which he claims demonstrate: (1) that the NCA is unenforceable, and (2) that information regarding pricing and customer purchases is not confidential.  Thus, Schupp urges, IDG fails to state any claim for relief.

### 1.    *Standard of Review*

Rule 12(c) of the Federal Rules of Civil Procedure allows for either party to move for judgment on the pleadings, "after the pleadings are closed—but early enough not to delay trial."  This is similar to a Rule 12(b)(6) motion to dismiss for failure to state a claim, except that a Rule 12(b)(6) motion comes before the close of pleadings.  In either case, the Court applies the same standard.  Irish Lesbian & Gay Org. v. Guiliani, 143 F.3d 638, 644 (2d Cir.1998).

For both 12(b)(6) and 12(c) motions, the district court must accept the factual allegations contained in the complaint as true and draw all reasonable inferences in favor

of the non-moving party. *Id*. The factual allegations contained in the complaint must satisfy a flexible plausibility standard, which obliges a pleader to amplify a claim with enough factual allegations to render the claim plausible. Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007). In other words, plaintiff's complaint must raise a right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 1965 (2007).

For purposes of Rules 12(c) and 12(b), the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2002); *see also*, Pifko v. CCB Credit Services, Inc., no. 09-CV-3057, 2010 WL 2771832, at *2 (E.D.N.Y. July 7, 2010). "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers, 282 F.3d at 153 (emphasis in original).

**2.    *Analysis***

With regard to IDG's first and second causes of action, Schupp asks that the Court accept as true the facts alleged in his speaking Answer, and also that it consider the documents appended to his Answer, which are not attached to, referenced in, or integral

to IDG's complaint.[2]   In short, Schupp seeks a ruling on the merits, based upon consideration of matters outside the pleadings.

The purpose of Rules 12(b)(6) and 12(c) is to test, in a streamlined fashion, the sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits. These Rules assess the legal feasibility of the complaint, but do not weigh the evidence that might be offered to support or oppose it.  Global Network Commus., Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. N.Y. 2006) (citations omitted).

"The streamlined testing of the substantive merits, on the other hand, is more appropriately reserved for the summary judgment procedure, governed by Rule 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule."  Id. (citations and internal quotation marks omitted). Summary judgment is the proper procedural device to consider "matters outside the pleadings" for purposes of Rules 12(b)(6) and 12(c).

This Court declines to treat Schupp's cross-motion as one for summary judgment. Because Schupp does not contend that the allegations in the Complaint, accepted as true, fail to state a claim for breach of contract, his cross-motion to dismiss the first and second causes of action is denied.

With regard to the third through fifth causes of action, which relate to Schupp's alleged misappropriation and use of confidential information, Schupp contends the

_____

[2]  Schupp has altered a case quotation in an attempt to bring his answer within the scope of documents a court can consider on a Rule 12 motion.  Needless to say, Plaintiff's attempt to create new law in this fashion is rejected.

Complaint fails to pass muster under Twombly because IDG has not identified with particularity the confidential information at issue. In response, IDG sets out the standard of review for Rule 12(c) motions, and simply concludes, without discussion, that this standard is met.

Pursuant to the NCA, Schupp covenanted that, in the event of termination of his employment, he would not, directly or indirectly:

> disclose to any person, firm, or corporation (except as expressly authorized in writng by the Company) the sales and marketing techniques of the Company; the name of any customer of the Company . . . ; the Company's pricing policy with respect to any such customer; the Company's sales volume to any such customer; the profit structure on services and goods handled by the Company; the identity of or any information relating to any design, improvement, or invention of the Company (whether or not developed by SCHUPP); any supplier of the Company; the quality control techniques of the Company; any "trade secret" of the Company; or any other confidential information or material relating to the Company, its services or goods, customers, suppliers, employees, or the operation of its business which has been obtained by him during or as a result of his employment by the Company.

(Complaint ¶ 18, Ex. A ¶ 7(d).) Schupp further recognized that trading upon "confidential information which he had received by virtue of his position of trust and confidence with [IDG] and upon the special relationships which he has established and maintained with the sponsorship of the Company" would result in "irreparable damage" to IDG. (¶ 17, Ex. A ¶ 6.)

Pursuant to the Confidentiality Agreement, Schupp agreed that he would hold IDG's trade secrets and confidential information in strictest confidence. (¶¶ 24-25, Ex. B.) "Confidential information" is defined therein as:

> any information, without regard to form, relating to Company's customers, operation, finances, and business that derives economic value, actual or potential, from not being generally known to other Persons, including, but not

limited to, technical or nontechnical data, formulas, patterns, compilations (including compilations of customer information), programs, devices, methods, techniques, processes, financial data or lists of actual or potential customers, suppliers and vendors (including identifying information about customers, suppliers and vendors) whether or not in writing. Confidential information includes information disclosed to Company by third parties that Company is obligated to maintain confidential.

(¶ 26, Ex. B.) During Schupp's employment, IDG provided him access to confidential information. (¶¶ 28-29, Ex. E.)

The further allegations that Schupp used his knowledge of IDG's major, revenue-generating customers and its pricing policies for the benefit of his new employer, and disclosed information regarding the Amherst Office's control over pricing issues to one of those customers (¶¶ 41-44, 48, 53-54), are sufficient to render the third through fifth causes of action plausible for purposes of a Rule 12(c) analysis.

Accordingly, Schupp's Cross-Motion to Dismiss is denied in its entirety.

## C.    IDG's Motion for a TRO and Preliminary Injunction

### 1.    *Standard of Review*

Injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." Med. Soc'y of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977); *see also*, Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 33 (2d Cir. 1991). "The legal standards for granting a temporary restraining order and a preliminary injunction are the same." Young-Flynn v. Wright, No. 05 Civ. 1488, 2007 WL 241332, at *7 (S.D.N.Y. Jan. 26, 2007) (quoting Gund, Inc. v. SKM Enters., Inc., No. 01 Civ. 0882, 2001 WL 125366, at *1 (S.D.N.Y. Feb. 14, 2001)). The movant must demonstrate:

(1) irreparable harm should the injunction not be granted, and
(2) either (a) a likelihood of success on the merits, or (b)

> sufficiently serious questions going to the merits and a balance
> of hardships tipping decidedly toward the party seeking
> injunctive relief.

N.A.A.C.P., Inc. v. Town of East Haven, 70 F.3d 219, 223 (2d Cir. 1995) (quoting

Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991)); *see also*, SmithKline

Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc., 211 F.3d 21, 24 (2d Cir.

2000).

### 2.    *The Parties' Arguments*

According to IDG, Schupp is wreaking havoc on its relationships with valued

customers and damaging its goodwill by improperly soliciting IDG customers on behalf of

an IDG competitor, and by  disclosing and using IDG's trade secrets and confidential

information.  IDG contends it is likely to succeed on the merits because all of Schupp's

conduct violates the restrictive covenants at issue and also Schupp's common law duties

to IDG.   Specifically, IDG argues that its restrictive covenants are reasonable and

enforceable, Schupp brought no customers with him to IDG and all the customer

relationships at issue were developed at IDG expense, confidential information Schupp

obtained during his employment with IDG regarding its clients' needs and requirements

and its pricing strategies are trade secrets, and Schupp has used or disclosed that

confidential information while improperly soliciting IDG customers.

In opposition, Schupp contends that the non-compete clauses at issue are

unenforceable because: (1) IDG was the first to breach the NCA when it reduced his

salary, and (2) because IDG constructively terminated him.  Schupp further urges that IDG

cannot show it is likely to succeed on any claim relating to the theft, disclosure, or use of

trade secrets or confidential information because it has not specifically identified any document(s) at issue. Finally, Schupp argues that IDG's purported damages are monetary only and, thus, are not irreparable.

### 3.  *Irreparable Harm*

In addition to the non-disclosure provision set forth above, the NCA provides that Schupp will not:

> (a)  For a period of twelve (12) months from the date of his termination . . ., in any way within a radius of fifty (50) miles of the place of business of the Company in which SCHUPP is assigned or has been assigned at any time within the period of twelve (12) months immediately preceding the date of his termination, accept employment from . . . any business which is competitive with the business of the Company . . . if SHUPP will be required or expected to perform any services or engage in any activities which are substantially similar to the services performed or activities engaged in by SCHUPP during the period of his employment by the Company; nor

> (b)  For a period of twelve (12) months from the date of his termination . . . solicit competitive orders or patronage on behalf of any business which is competitive with the Company . . . from any customer of the Company which has been assigned by the Company to SCHUPP or with which SCHUPP has had any contact during the period of his employment by the Company; and for the purpose of this paragraph (7) "customer of the Company" shall be defined as any person, firm or corporation, wherever located, which within twelve (12) months immediately preceding the termination of the employment of SCHUPP has purchased services or goods from the Company having a total cost greater than Twenty-Five Thousand Dollars ($25,000.00); . . . .

(Compl., Ex. A ¶ 7.)

The parties further acknowledged that:

> any breach of the [NCA's] covenants by SCHUPP would not be readily or appropriately compensable in damages, and expressly agree that in addition to all other available remedies at law or in equity, each covenant by SCHUPP shall be enforceable by injunctive relief.

(*Id.* ¶ 7(e)).

With regard to Schupp's sales position, the parties recognized that:

> by virtue of his employment as a key employee of the Company, SCHUPP will enjoy a position of especial trust and confidence with the Company; he will receive special training to perform his duties for the Company . . .; he will have access to various confidential information compiled and maintained by the Company about customers of the Company; he will be informed about the long-standing relationship between the Company and certain customers and familiarized with the special requirements of various customers of the Company; he will . . . be acquainted with all of the special sales and marketing techniques which have been involved by the Company in its business and which are not generally known or used and which are extremely valuable to the Company; . . . ; he will be familiarized with special sales techniques and product knowledge developed by and exclusive with the Company; he will be advised about various aspects of the profit structure on goods and services provided by the Company; and he will be given direct assistance . . . in maintaining and reinforcing relationships between the Company and its customers. The parties also recognize that if SCHUPP is permitted, after cessation of his employment with the Company, to trade upon this training and this confidential information which he had received by virtue of his position of trust and confidence with the Company and upon the special relationships which he has established and maintained with the sponsorship of the Company, irreparable damage will result to the Company.

(*Id.* ¶ 6.)

Thomas Lewis, Regional Sales Manager for IDG's Amherst branch office, attests that he assigned to Schupp all of the customers he serviced for IDG throughout his employment. (Lewis Aff. ¶¶ 29-30.) This included thirteen "major" customers, seven of which IDG acquired when it purchased the assets and good will of Austin Ford Logan. (Lewis Aff. ¶ 31; Lingenfelter Reply Aff. ¶ 5.) While employed at IDG, Schupp was fully reimbursed for his transportation expenses and for funds expended to build and maintain IDG's good will with customers. (Lewis Aff. ¶¶ 33-37, Ex. 6.) While at IDG, Schupp was necessarily privy to private information about IDG's business operations, including sales and marketing techniques and various aspects of IDG's profit structure on goods and services. (¶¶ 26, 28.)

13

After Schupp resigned from IDG, he "almost immediately" began work as a sales representative with IDG competitor Abrasive, which sells many of the same products as IDG and offers similar services. (¶¶ 38, 41-44.) Schupp works out of Abrasive's Buffalo office, which is less than ten miles from IDG's Amherst office. (¶ 46.)

Lewis attests he was told by IDG employees or customers that, soon after Schupp began working at Abrasive, he contacted three "customers of the Company" (i.e., customers whose purchases from IDG exceeded $25,000 in the previous twelve months, hereafter "Major Customers.") (¶¶ 51, 54-55, 57, 59, 62.) Lewis had assigned Schupp to service each of these Major Customers for IDG. (¶¶ 52, 56, 61.) Schupp quoted prices for Abrasive's goods and services to one of these Major Customers, and another called IDG and informed it that the Customer would be considering quotes from other companies in the future. (¶¶ 55, 60.) This activity apparently occurred between Schupp's January 14, 2010 resignation and Lewis's February 1, 2010 affidavit.

In addition, during that same period, three Major Customers requested pricing information and quotes from IDG, something they had not required in the previous ten years. (¶¶ 31, 64-65, 68.) Again, Schupp had serviced these three Major Customers while employed at IDG. (¶¶ 66-68.) After commencing work for Abrasive, Schupp contacted one of these three Major Customers and relayed confidential information regarding the Amherst Office's control over pricing issues. (¶ 71.)

Yet another Major Customer who was serviced by Schupp informed IDG that it would no longer do business with IDG. (¶¶ 65-66.) In the month following Schupp's resignation from IDG, IDG experienced a reduction in its sales to ten of the thirteen Major Customers which had been serviced by Schupp. (Lewis Reply Aff. ¶¶ 4-5.)

Based on the foregoing, IDG argues that Schupp is using his knowledge of IDG's customer requirements and confidential pricing policies to undercut IDG's quotes for goods and services, thereby jeopardizing its customer relationships.  IDG further contends that, as a result of Schupp's disclosure of its strategic pricing policy, IDG's good will is being irreparably damaged.

In opposition to IDG's motion, Schupp concedes that since his resignation from IDG, he has been soliciting the Major Customers he serviced while at IDG.  (Schupp Aff. ¶ 12.)  However, Schupp disputes the assertion that he has used and/or disclosed confidential information to sell products or services.  He attests that he did not take any documents with him when he left IDG (Schupp Aff. ¶¶ 12-13; Schupp Reply Aff. ¶ 13), and that "[a]ny information I did have in my mind was otherwise available publicly" (Schupp Aff. ¶ 11; Schupp Reply Aff. ¶ 13).  Schupp then generally avers that "[c]ustomers will tell the sales representative what the competitor has charged" and "customers readily offer whatever information is needed to obtain the best pricing."  (Schupp. Aff. ¶ 14.)  In his memorandum of law, Schupp contends that IDG cannot show irreparable harm because, even assuming its claims have merit, its only arguable damage is monetary in nature.

"'To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  And, irreparable harm must be shown to be actual and imminent, not remote or speculative.'" Parry v. Haendiges, 458 F. Supp. 2d 90, 94-95 (W.D.N.Y. 2006) (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)).

For the following reasons, I find that IDG has met its burden of showing that

Schupp's continued solicitation of Major Customers will cause irreparable harm absent injunctive relief.

"'Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm.'" RESCUECOM Corp. v. Mathews, 05-CV-1330, 2006 U.S. Dist. LEXIS 41042, at *6 (N.D.N.Y June 20, 2006) (quoting Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004)). As the Second Circuit has noted, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir. 1999). So, injunctive relief is ordinarily appropriate when a non-compete clause is violated by an employee with unique client relationships because "if the unique services of such employee are available to a competitor, the employer obviously suffers irreparable harm." Johnson Controls, Inc., 323 F. Supp. 2d at 532 (quoting Ticor, 173 F.3d at 70 (2d Cir. 1999)).

Here, IDG has sufficiently demonstrated that Schupp violated paragraph 7(a) of the NCA when he commenced work at Abrasive, as a sales associate in its Buffalo office, immediately after resigning from IDG. Likewise, IDG has sufficiently demonstrated that Schupp immediately began soliciting orders on Abrasive's behalf from IDG's Major Customers in violation of the NCA's paragraph 7(b). Schupp does not dispute IDG's attestations in this regard.

In addition, the NCA expressly provides that "if Schupp is permitted, after cessation of his employment with [IDG], to trade upon th[e] training and th[e] confidential information which he had received by virtue of his position of trust and confidence with [IDG] . . .

*irreparable damages will result to [IDG]*," (¶ 6) and that "any breach of the [NCA's] covenants . . . *would not be readily or appropriately compensable in damages*" (¶ 7(e)). (emphasis supplied.) Courts have found that such language in an employment agreement "'might arguably be viewed as an admission by [the former employee] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete agreement.'" *See* Estee Lauder Companies Inc. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting Ticor Title Insurance Co. v. Cohen, 173 F.3d 63, 68-69 (2d Cir. 1999) [alteration added]); Nat'l Elevator Cab & Door Corp v. H & B, Inc., 282 Fed. Appx. 885, 887 (2d Cir. N.Y. 2008) (upholding district court's finding that respondent's endorsement of an agreement constituted an additional factor weighing in favor of the conclusion that the movant had made the required showing of irreparable harm).

On the evidence presented at this juncture, including the NCA's provisions, Schupp's conclusory assertion that any damage to IDG can be rectified by a monetary award is rejected.

Schupp's further contention that he has not violated the NCA's non-disclosure provision (¶ 7(d)) or Confidentiality Agreement also does not alter this Court's conclusion regarding irreparable harm. IDG contends that its "trade secrets" include customer needs and requirements, pricing strategies, special sales and marketing techniques, and aspects of its profit structure on goods and services, and that it has suffered irreparable harm from their use and disclosure. Schupp acknowledged the confidential nature of each of these matters, and also his receipt of such information, when he signed the at-issue agreements. Thus, his generalized assertions that the information is publicly available and not confidential are unpersuasive.

IDG specifically attests that after leaving IDG, Schupp contacted a particular Major Customer and relayed confidential information regarding IDG's Amherst Office's control over pricing issues—*i.e.*, pricing strategy and/or profit structure. Schupp ignores this specific attestation and generally posits that he would have been unable to memorize the pricing of tens of thousands of different items he sold while at IDG. Knowledge of item prices and knowledge of price-setting policies are two entirely different things.

Schupp also asserts that pricing information is not confidential because customers will tell the sales representative what a competitor has charged for specific volumes and items in order to obtain a better price. Even assuming this is the case and that the customer provides truthful information, again, knowledge of particular item pricing is not the same as knowledge of pricing strategy or policy.

Finally, Schupp concludes that because he did not take any documents from IDG, he could not have disclosed any trade secret. However, a physical taking is not necessary to a finding that trade secret protections have been violated. Inflight Newspapers v. Magazines In-Flight, LLC, 990 F. Supp. 119, 127 (E.D.N.Y. 1997) In short, Schupp acknowledged that he received confidential information from IDG, and has not expressly denied the identified disclosure. In executing the NCA, Schupp conceded that disclosure of confidential information would result in irreparable harm. Thus, I find that IDG has met its burden of showing a breach of the NCA's non-disclosure provision, a breach of the Confidentiality Agreement, and consequent potential harm to its customer relationships.

For all of these reasons, IDP has sufficiently demonstrated that it will suffer irreparable injury absent an injunction.

**4.**     ***Likelihood of Success on the Merits***

The framework for evaluating this factor is well-established: "[i]n addressing the merits of the 'ultimate case [underlying a motion for a preliminary injunction], a court is not called upon finally to decide the merits of the controversy.'" <u>Mullins v. City of New York</u>, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (internal citations omitted). "[S]uccess need not be a certainty to obtain a preliminary injunction." <u>Cooperstown Capital, LLC v. Patton</u>, 60 A.D.3d 1251, 1253, 876 N.Y.S.2d 186 (N.Y.A.D. 3 Dept. 2009) (citing cases).

　　　　a.     <u>The Breach of Contract Claims (First, Second, and Third)</u>

This Court already has concluded, as set forth above, that IDG has sufficiently demonstrated that Schupp breached the NCA's non-compete, non-solicitation, and non-disclosure provisions for purposes of this preliminary injunction motion.

However, Schupp argues that regardless of that showing, IDG is not likely to succeed on the merits of its breach of contract claims (First, Second, and Third Causes of Action) because the NCA's restrictive covenants are unenforceable. This is due, according to Schupp, to IDG's having breached first by reducing his salary and/or due to its having constructively discharged Schupp.

　　　　　*i. Salary Reduction*

The following facts are taken from the affidavits and exhibits. At some point prior to March 11, 2008, Schupp asked his supervisors, Robert Carbone and Thomas Lewis, for a pay raise. (Schupp Reply Aff., ¶ 5.) Schupp attests Carbone and Lewis told him that he would not receive a raise unless he signed a non-compete agreement. (Schupp Reply Aff. ¶¶ 5, 8.) Carbone and Lewis each deny making such a statement. (Docket NO. 28 at 1-2.)

On March 11, 2008, Carbone completed a "Personnel Action Request," requesting

that Schupp receive a performance upgrade from "Account Manager" to "Account Executive" and a salary increase from $70,700 to $77,047, to be applied retroactive to January 1, 2008.  (Lingenfelter Reply Aff. ¶ 10 and Ex. 9; Lewis Reply Aff. ¶¶ 16-17.)  The form lists the "Amount of Non-Compete (if required)" as $3,000.  (*Id.* Ex. 9.)  Carbone's request was approved, and appears to have become effective on or about May 16, 2008.  (*Id.* (change approved as of 4/30/08 and "entered" on 5/16/08).)

Sometime after November 2005, IDG began requiring that its Sales and Marketing Associates and other upper management personnel sign restrictive covenants to protect the significant investment IDG makes in its clients.  (Lingenfelter Reply Aff. ¶¶ 1, 7-8.)  The signing of an agreement often occurred in conjunction with a change in title or responsibilities.  IDG required that Schupp sign an agreement (the NCA), and he did so on May 27, 2008.  (Lewis Aff. ¶ 13; Schupp Reply Aff. ¶ 5; Compl., Ex. A.)

In addition to setting forth the restrictive covenants at issue, the NCA identifies Schupp's new title, details his responsibilities, and sets forth his annual salary.  (Compl., Ex. A ¶¶ 1-2.)  The NCA also includes an employment at-will provision stating that "[e]ither the Company or SCHUPP may terminate the employment of SCHUPP under this Agreement with or without "cause"; . . . after two (2) week's written notice to the other." (*Id.* ¶ 4.)  IDG paid Schupp $3,000.00 in consideration for executing the NCA.  (Lewis Aff. ¶ 20; Schupp Reply Aff. ¶ 5; Compl., Ex. A at 5.)

On March 2009, IDG reduced Schupp's base salary to approximately $71,000.  (Schupp Aff. ¶ 4; Lewis Aff. ¶ 80.)  That action was pursuant to a company-wide Salary

Reduction Plan ("Plan"),[3] adopted as a result of the economic downturn that began in late 2008 and led to a substantial decrease in IDG's sales.  (Lewis Aff. ¶ 81; Lingenfelter Reply Aff. ¶ 13.)  The Plan, which became effective on March 1, 2009, was intended as a measure to avoid lay-offs.  (Lewis Aff. ¶ 82; Lingenfelter Reply Aff. ¶ 14.)  Most employees whose pay was reduced did not have employment agreements such as Schupp's NCA.  (Schupp Aff. ¶ 5.)

Effective October 1, 2009, thirty percent of the March 1st salary reduction was restored to Schupp and others in his same salary range.  (Lingenfelter Reply Aff. ¶ 14.)  Thus, the actual salary reduction Schupp realized was 6.67 percent.  (Schupp Reply Aff. ¶ 7.)  Following the March 1, 2009 salary reduction, Schupp continued to work for IDG for more than ten months without voicing any complaint to management about the reduction.  (Lingenfelter Aff. ¶ 16.)

There is no dispute that IDG reduced Schupp's annual salary from that stated in the NCA.  Schupp contends it is "hornbook law" in New York that this breach renders the restrictive covenants unenforceable.  Yet the cases it cites in support do not apply New York law.  (Docket No. 25 at 3-9.)

IDG urges that because the salary reduction was not a "material breach," Schupp is not excused from performance of his obligations and, in any event, Schupp waived any breach when he continued to work for IDG after his salary was modified.  IDG cites to New York law for both of these propositions.  However, Schupp takes issue with those citations, arguing that they are inapplicable because they do not involve employment agreements.

---

[3] One job title—Full Store Room Management Site Associates—was not impacted by the Plan. These employees work at customer locations and the customers reimburse for their compensation pursuant to an agreement with IDG.  (Lingenfelter Reply Aff. ¶ 13.)

The Court finds IDG's contentions that it did not materially breach the agreement and that Schupp acquiesced to a modification of the NCA are consistent with New York decisional authority involving employment agreements similar to the NCA.

As noted above, the NCA includes an at will provision. It is well-settled that an employer's right to terminate an employee at will includes the right to change the material terms of a contract, at any time, for any reason. In re Footstar, Inc., 04-22350, 2007 Bankr. LEXIS 2302, at *12-13 (S.D.N.Y. July 6, 2007) (citing Hanlon v. MacFadden Publications, 302 N.Y. 502, 505 (1951)); Bottini v. Lewis & Judge Co., 211 A.D.2d 1006, 1007-1008 (3d Dep't 1995).

It has also been held that when an employer exercises this right to modify an at will employee's contract by changing that employee's terms of compensation, and the employee chooses to remain in the employer's employ after being advised of that change, that employee is deemed to have acquiesced to the contract modification. See, e.g., Dwyer v. Burlington Broadcasters Inc., 295 A.D.2d 745, 745-746 (3d Dep't 2002); Gebhardt v. Time Warner Entm't-Advance/Newhouse, 284 A.D.2d 978, 978-9 (4th Dep't 2001); Bottini, 211 A.D. 2d at 1007-1008; Mosely v. Island Computer Prods., 2006 U.S. Dist. LEXIS 6437, 2006 WL 318815, at *2-4 (E.D.N.Y. Feb. 9, 2006).

Accordingly, Schupp has not demonstrated that the restrictive covenants are unenforceable due to IDG's having breached the NCA.

### ii. Constructive Termination

Schupp alternatively claims constructive termination based on five IDG actions he contends impacted him financially and led him to conclude that the "writing was on the wall" and he needed to find a new position before his career was totally destroyed—the salary

reduction discussed above, IDG's pricing policy, his 2009 incentive goals, customer reassignment, and IDG's leave policy. The following facts, drawn from the affidavits and exhibits, are undisputed.

IDG announced a strategic pricing policy in February 2008 that appears to have remained in effect during the time period at issue—*i.e.*, until Schupp's resignation. (Lingenfelter ¶ 20.) That pricing policy increased profit margins, which Schupp contends negatively impacted his sales. (Schupp Aff. ¶¶ 8-9; Schupp Reply Aff. ¶ 10.)

IDG pays its sales associates an annual "incentive" based on performance, as measured against his or her individual budget established prior to the beginning of each year. (Lingenfelter Reply Aff. ¶ 22.) The budget is based on prior year's sales, with an increase tied to economic conditions. (*Id*. ¶ 23.) IDG began to develop individual 2009 budgets in October 2008. (*Id*. ¶ 24; Lewis Reply Aff. ¶¶ 22-23.) In or about February 2009, Schupp was told he would need to achieve a 13 percent increase over his 2008 budget to realize incentive pay in 2009. (Lewis Reply Aff. ¶ 21; Schupp Aff. ¶ 8.) This was a lesser increase than was budgeted for Schupp in the three prior years— 17.74 percent in 2008, 23.8 percent in 2007, and 21.14 percent in 2006. (Lewis Reply Aff. ¶ 21.) Schupp's 2009 budget was developed before the manufacturing industry was hit by the economic downturn. (Lewis Reply Aff. ¶ 22; Schupp Reply Aff. ¶ 11.)

In addition to implementing its Salary Reduction Plan and 2009 incentive budgets, IDG demoted Schupp's two supervisors, one of whom was then assigned to join Schupp and Carbone in a sales position in the Amherst office. (Schupp Aff. ¶ 10.) Because there were now three, instead of two, sales representatives, IDG reassigned five of Schupp's "best customers" to the other sales associates. (*Id*.; Schupp Reply Aff. ¶ 12.) The five

customers represented approximately $400,000 in sales for Schupp. (Schupp Reply Aff. ¶ 9.)

When an account is reassigned from one sales associate to another, the projected revenue budgeted for that customer also is reassigned, so the employee who loses that customer is not penalized for the related loss of revenue for purposes of incentive compensation. (Lingenfelter Reply Aff. ¶ 26.) IDG has transferred customers between and among sales associates on a regular basis in the past, and Schupp has received new customers and lost established customers through such transfers. (*Id*. ¶ 7; Schupp Reply Aff. ¶ 9.) In previous instances where a customer was transferred from Schupp, only one customer was involved and the transfer was discussed with him in advance. That was not the case with regard to these five accounts. (Schupp Reply Aff. ¶ 9.)

IDG replaced a week of Schupp's paid vacation with a week of paid sick leave. (Schupp Aff. ¶ 9.) This action was pursuant to IDG's development and implementation of a company-wide vacation and sick leave policy. (Lingenfelter Reply Aff. ¶ 29.)

New York courts have concluded that, when an employment contract is for a specified term, an employer's unjustifiable reduction of an employee's rank or salary, or material change in duties may constitute an involuntary termination and also a breach of the employment agreement which renders restrictive covenants unenforceable. *See, e.g.*, Excelaire Serv., Inc. v. Woliewicz, 04-20047, 2006 N.Y. Misc. LEXIS 2634, at *10 (Suffolk Cnty. Aug. 23, 2006) (employment for one-year term); Rudman v. Cowles Commc'ns, Inc., 30 N.Y>2e 1 (1972) (five-year term); Aurielen Lintermans, Inc. v. Resca, 222 A.D.2d 253 (three-year term). In determining whether an employee has been involuntarily terminated, New York courts have employed the constructive discharge test from federal employment

discrimination law. *Id.* at *8-9; Morris v. Schroder Capital Mgmt. Int'l, 7 N.Y.3d 616, 621-22 (2006) (case involving "employee choice doctrine"). Assuming, for purposes of this motion, that this standard is applied by New York in the employment at will context, the evidence presented does not suggest Schupp was involuntarily terminated.

Under federal law, constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996) *Id.* (citation omitted). The first factor is satisfied by proof that an employer acted with the specific intent to prompt the employee's resignation. Petrosino v. Bell Atlantic, 385 F.3d 210, 220 (2d Cir. 2004) The second factor involves an objective assessment as to whether "the abusive working environment became so intolerable that [the employee's] resignation qualified as a fitting response." Pennsylvania State Police v. Suders, 542 U.S. 129, 134, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004); *see also,* White v. City of New York, 09-CV-10127, 2010 U.S. Dist. LEXIS 67402, at *11 (S.D.N.Y. July 7, 2010). A high threshold of severity is required for a constructive discharge claim. Virola v. XO Communs., Inc., 05-CV-5056, 2008 U.S. Dist. LEXIS 30413, at *66 (E.D.N.Y. Apr. 15, 2008)

Under federal law, diminished pay may constitute a constructive discharge. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 157-58, 161-62 (2d Cir. 1998) (upholding jury finding of constructive discharge where employer reduced salesman's salary by 57 percent and reassigned customer who accounted for 40-45 percent of his sales, and evidence suggested actions were based on employee's age); Morris v. N.Y. City Dep't of Sanitation, 99-CV-4376, 2003 U.S. Dist. LEXIS 5146, at *2-4, 14-15 (S.D.N.Y. Mar. 31, 2003)

(allegations that employer told employee he needed to make way for younger employees and if he did not retire he would be demoted two levels, his salary would be reduced by 28 percent, and his pension benefits diluted, were sufficient to allege *prima facie* case of constructive discharge). But a reduction in pay, without additional evidence of malicious intent, is insufficient. Butts v. N.Y. City Dep't of Hous. Preservation & Dev., 00-CV-6307, 2007 U.S. Dist. LEXIS 6534, at *72 (S.D.N.Y. Jan. 29, 2007). Moreover, when a plaintiff continues in a position after occurrence of the conduct allegedly designed to force him to resign, it undermines any claim that the working conditions were intolerable. *Id*. at *73 (citations omitted).

Applying this standard, Schupp has not sufficiently demonstrated, at this stage, that IDG constructively discharged him such that it is unlikely to prevail on its breach of contract claims. Most of the conduct of which Schupp complains—the salary reduction, IDG's 2008 pricing policy, and the revised leave policy—were company-wide actions that were not specifically directed toward him. Schupp's 2009 budget, which he concedes was developed prior to the economic downturn (Schupp Reply Aff. ¶ 11), established more favorable terms than had been applied in the three prior years. Finally, Schupp attributes the reassignment of customers to a supervisor's demotion and the consequent restructuring of the Amherst office, and he does not dispute that he lost and gained customers through transfer in the past. Thus, while he may have felt the "writing was on the wall," he has not identified directed actions by IDG taken for the purpose of forcing him to resign. Moreover, the purported existence of intolerable working conditions is undermined by the fact that Schupp remained employed by IDG for more than ten months to almost two years following implementation of the new pricing policy (February 2008), his

26

2009 budget (February 2009), and the Salary Reduction Plan (March 1, 2009).

Accordingly, this Court finds IDG has sufficiently demonstrated a likelihood of success on the merits of its breach of contract claims (First, Second, and Third Causes of Action).

b.    <u>Unfair Competition — Fourth Cause of Action</u>

In its fourth cause of action, IDG contends that Schupp has engaged in unfair competition by using its confidential information, including its pricing strategies, to IDG's detriment.

"Unfair competition is the misappropriation for commercial advantage of a benefit or property right belonging to another." <u>Vision Specialty Food Products, Inc. v. Ultimate Gourmet, L.L.C.</u>, No. 01 Civ. 3497, 2001 WL 1506008, at *5 (S.D.N.Y. Nov. 26, 2001) (citing <u>Dior v. Milton</u>, 155 N.Y.S.2d 443, 451 (N.Y. Sup.Ct. 1956), *aff'd*, 156 N.Y.S .2d 996 (App.Div.1956)).   This doctrine includes an employee's misappropriation of a former employer's confidential information, *see, e.g.*, <u>Comprehensive Comm. Dev. Corp. v. Lehach</u>, 636 N.Y.S.2d 755, 756 (1st Dep't 1996); <u>Advanced Magnification Instruments v. Minuteman Optical Corp.</u>, 522 N.Y.S.2d 287, 289 (3d Dep't 1987), and trade secrets, *see* <u>Linkco, Inc. v. Fujitsu Ltd.</u>, 230 F. Supp. 2d 492, 497-98 (S.D.N.Y. 2002).  "The concept of unfair competition has been interpreted liberally." <u>Vision Specialty Food Products, Inc.</u>, 2001 WL 1506008, at *5 (citing <u>Marcraft Recreation Corp. v. Frances Devlin Co.</u>, 459 F.Supp. 195, 197 (S.D.N.Y.1978)).

Because IDG has demonstrated a likelihood of success on the merits on its third cause of action—disclosure of confidential information — this Court finds that IDG has also demonstrated a likelihood of success on the merits for its fourth cause of action based on

27

unfair competition.

       c.     <u>Theft of Trade Secrets - Fifth Cause of Action</u>

IDG's Fifth Cause of Action alleges that Schupp has misappropriated its customer list, information about customers' special requirements, and information about IDG's sales and marketing techniques. IDG further alleges this information is secret and confidential. As previously noted, the Court has rejected Schupp's argument that a physical taking is necessary to demonstrate that confidential information or a trade secret has been misappropriated. *See* <u>Topps Co., Inc. v. Cadbury Stani S.A.I.C.</u>, 380 F. Supp. 2d 250, 267 (S.D.N.Y. 2005) (quoting Restatement (First) of Torts § 757 cmt. B (1939) ("The Rule delineated in the Restatement of Torts–which New York Courts regularly cite as the basis for the tort of misappropriation–'rests not upon a view of trade secrets as physical objects of property but rather upon abuse of confidence of impropriety in learning the secret'")).

To prevail on its claim of misappropriation of a trade secret, IDG must demonstrate that: "(1) it possessed a trade secret, and (2) [defendant is] using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." <u>Integrated Cash Mgmt. Servs. Inc. v. Digital Transaction, Inc.</u>, 920 F.2d 171, 173 (2d Cir. 1990) (applying New York law). "[A] trade secret may consist of a formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." <u>Inflight Newspapers, Inc.</u>, 990 F. Supp. at 126. "[C]onfidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." <u>In re Dana Corp.</u>, 574 F.3d 129, 152 (2d Cir. 2009); *see also, e.g.*, <u>Lehman v. Dow Jones & Co.</u>, 783 F.3d 285, 298 (2d Cir. 1986) (cost and pricing information are trade secrets); <u>Medtech Prods. Inc. v.</u>

Ranir, LLC, 596 F. Supp. 2d 778, 804 (S.D.N.Y. 2008) (supplier lists and pricing information are trade secrets); Doubleclick Inc. v. Henderson, No. 116914 Civ. 97, 1997 WL 731413, at *7 (Sup. Ct. N.Y. County Nov. 7, 1997) (proprietary information concerning pricing, margins, and customers held to be trade secrets).

Here, the Confidentiality Agreement prohibits the disclosure of "trade secrets," which is defined "under applicable law." (Docket No. 2, Ex. 2, ¶ a.) Data related to pricing information constitutes a trade secret. In re Dana Corp., 574 F.3d at 152. Schupp also agreed in the NCA that information related to IDG's "profit structure" constitutes confidential information, and further agreed not to disclose such information. Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (when determining whether something qualifies as a trade secret, courts have considered, "the extent to which the information is known outside of the business [and] the extent of measures taken by the business to guard the secrecy of the information"). And, of course, as already noted, Schupp does not controvert IDG's averments regarding his disclosure of the Amherst office's control over pricing issues.

Based on the foregoing, the Court finds IDG has demonstrated it is likely to succeed on its Fifth Cause of Action.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is granted, and Defendant's Cross-Motion to Dismiss is denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Temporary Restraining Order

and Preliminary Injunction (Docket No. 2) is GRANTED.

FURTHER that Defendant is preliminarily enjoined from engaging in work on behalf of any business which is competitive with IDG, within fifty miles of IDG's Amherst Office;

FURTHER that Defendant is preliminarily enjoined from soliciting competitive orders on behalf of any business which is competitive with IDG, from any customer to whom Defendant was assigned during his employment with IDG and which purchased goods and services having a total cost of $25,000 during the twelve months prior to Defendant's resignation date;

FURTHER that Defendant is preliminarily enjoined from disclosing and/or using IDG confidential information and/or trade secrets.

FURTHER, that Defendant's Cross-Motion to Dismiss (Docket No. 18) is DENIED.

SO ORDERED.

Dated: August 15, 2010
        Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court