UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IDG USA, LLC,

                    Plaintiff,

          v.                                          **DECISION AND ORDER**
                                                      10-CV-76S(F)
KEVIN J. SCHUPP and
ABRASIVE-TOOL CORP.,

                    Defendants.

## I. INTRODUCTION

Plaintiff IDG USA, LLC ("IDG") commenced this action on January 29, 2010, alleging that its former employee, Kevin J. Schupp, breached a Non-Compete Agreement and a Confidentiality Agreement, and engaged in unfair competition and theft of trade secrets. (Docket No. 1.)  On May 12, 2011, IDG filed an Amended Complaint to add Abrasive-Tool Corp. ("Abrasive"), Schupp's subsequent employer, as a Defendant, asserting claims of tortious interference with contract, unfair competition, and unjust enrichment.  (Docket No. 67.)  In answer to the Amended Complaint, Schupp asserted one counterclaim against IDG.  Presently before the Court is Abrasive's Motion for Summary Judgment and IDG's Motion for Partial Summary Judgment.  For the reasons set forth below, Abrasive's motion is granted in its entirety, and IDG's motion is granted in part, and denied in part.

1

## II.  BACKGROUND

**A.     The Facts**

The facts are drawn from the parties' respective Rule 56 statements, as supported by their citations to the record, and from prior relevant affidavits and exhibits.[1]

**1.      *The Parties***

IDG is a national distributor of industrial materials and supplies, such as abrasives, brushes, chemicals, lubricants and adhesives, cutting tools, dispensing solutions, electrical supplies, fasteners, fluid power supplies, hand tools, janitorial supplies, material handling equipment, maintenance equipment and supplies, power tools, power transmission supplies, pumps, quality control supplies, safety supplies, saw blades, and tapes.  Its corporate headquarters is located in Belmont, North Carolina, and it has facilities across the country, including in Amherst, New York.  Salespersons from IDG's Amherst office call on customers and potential customers throughout upstate New York and western Pennsylvania (the "Sales Territory").

Abrasive also is a distributor of industrial materials and supplies, such as grinding wheels, cutting tools, carbide inserts, precision tools, measuring equipment, hand tools, machine accessories, shop supplies, and machinery.  Its principle place of business is Rochester, New York, and it also has operations in Buffalo and Syracuse, New York.

Schupp is a former outside salesperson and employee of IDG's Amherst office, and is now working as an outside salesperson at Abrasive's Buffalo office.  IDG and Abrasive are competitors in the Buffalo market and sell many of the same industrial products and

---

[1]  Record citations are provided only for the earlier filed documents.

supplies.

### 2. *Schupp's Employment at IDG*

In 1998, IDG acquired Austin Ford Logan, Inc., a cutting tool operation. IDG retained most of Austin's employees, including Schupp, who immediately commenced employment as an IDG sales associate. He was assigned to make calls within the Sales Territory and to solicit business from existing IDG customers and potential customers.

In or about early 2008, Schupp asked his supervisors, Robert Carbone and Thomas Lewis, for a pay raise. (Docket No. 25-2, ¶ 5.) Lewis told Edward Gerber, IDG's Vice President of Sales and Marketing, that Schupp deserved a promotion to account executive and an increase in his base salary. Gerber approved the promotion and a raise.

At some time prior to these events, Charles Lingenfelter, who became IDG's CEO in 2005, determined it was important that IDG employees entrusted with customer relations sign non-compete agreements to protect the investment IDG made in client development. By way of example, IDG notes that, from 2006 to 2009, it reimbursed Schupp for over $52,000 in business development and entertainment expenses, and provided him a company car and fuel credit card.

Lingenfelter directed IDG's personnel department to implement procedures by which sales associates and other upper management personnel would sign restrictive covenants. (Docket No. 24-2 ¶¶ 6-8.) Thereafter, new hires were presented with non-compete agreements. For current employees who had been working without a non-compete, IDG believed a promotion event was a reasonable time to bring up the subject, ask the individual to sign a non-compete, and advise the employee that IDG was willing to compensate him or her to enter into the non-compete.

As part of its decision to promote Schupp, IDG presented him with a non-compete. Currently, about 75 percent of IDG's outside salespersons have executed such agreements and, according to Gerber, Schupp could have refused to sign the NCA without consequences "to his current employment." (Gerber Dep. at 135, 137.)  Schupp executed the NCA on May 27, 2008.  The NCA identifies Schupp's new title, details his responsibilities, and sets forth his new annual base salary of $77,047, increased from $70,700.  (Compl., Ex. A ¶¶ 1-2.)  Schupp acknowledged his receipt of "additional compensation in the amount of Three Thousand Dollars ($3,000) in consideration for his execution, delivery, and performance of th[e] [NCA] (specifically including without limitation the non-competition and non-disclosure covenants contained in this paragraph (7))."  (Id. at 5, 8.)

The following year, in March 2009, IDG reduced Schupp's base salary to approximately $71,000.  (Docket Nos. 23 ¶ 4; 2-2 ¶ 80.)  That action was pursuant to a company-wide Salary Reduction Plan ("Plan"),[2] adopted as a result of the economic downturn that began in late 2008 and led to a substantial decrease in IDG's sales.  (Docket Nos. 2-2 ¶ 81; 24-1 ¶ 13.)  The Plan, which became effective on March 1, 2009, was intended as a measure to avoid lay-offs.  (Docket Nos. 2-2 ¶ 82; 24-1 ¶ 14.)  Effective October 1, 2009, thirty percent of the March 1st salary reduction was restored to Schupp and others in his same salary range.  (Docket No. 24-1 ¶ 14.)  The actual salary reduction Schupp realized was 6.67 percent.  (Docket No. 25-2 ¶ 7.)  It is Schupp's contention that

---

[2] One job title—Full Store Room Management Site Associates—was not impacted by the Plan. These employees work at customer locations and the customers reimburse for their compensation pursuant to an agreement with IDG.  (Lingenfelter Reply Aff.  ¶ 13.)

this salary reduction constituted a withdrawal of part of the consideration offered in connection with the NCA.

As discussed fully below, Schupp is no longer employed at IDG, and the enforceability of the NCA—specifically, the following provisions—is now in dispute:

(7) SCHUPP therefore covenants that in the event of the termination of his employment with [IDG], whether by him or [IDG], for cause or otherwise, he will not, either directly or indirectly:

(a) For a period of twelve (12) months from the date of his termination . . ., in any way within a radius of fifty (50) miles of the place of business of the Company in which SCHUPP is assigned or has been assigned at any time within the period of twelve (12) months immediately preceding the date of his termination, accept employment from . . . any business which is competitive with the business of the Company . . . if SHUPP will be required or expected to perform any services or engage in any activities which are substantially similar to the services performed or activities engaged in by SCHUPP during the period of his employment by the Company; nor

(b) For a period of twelve (12) months from the date of his termination . . . solicit competitive orders or patronage on behalf of any business which is competitive with the Company . . . from any customer of the Company which has been assigned by the Company to SCHUPP or with which SCHUPP has had any contact during the period of his employment by the Company; and for the purpose of this paragraph (7) "customer of the Company" shall be defined as any person, firm or corporation, wherever located, which within twelve (12) months immediately preceding the termination of the employment of SCHUPP has purchased services or goods from the Company having a total cost greater than Twenty-Five Thousand Dollars ($25,000.00); . . . .

### 3.     *Schupp's Departure from IDG*

Schupp attests that he first considered leaving IDG around March 2009, the month in which IDG reduced his pay. At that time, he put out some "feelers" by telling people he knew in the industry—vendors, suppliers, and other distributors—that he was looking for work. According to Schupp, March of 2009 was the worst time in his 20 year career in the industry to be looking for a job. Nevertheless, he did hear about some opportunities. He

decided not to follow up on them because they were far away or would require a lot of overnight travel, which Schupp wasn't interested in.

In approximately mid-2009, IDG adopted a "strategic pricing policy" that Schupp believed might cause him to lose business. He identifies this change, as well as some pre-2009 changes—*i.e.* a reduction in vacation time and 401(k) match—as some of the reasons he became further dissatisfied at IDG. In late summer 2009, Schupp ran into Dan Gemmer, a prior IDG employee who had been working as an outside salesperson for Abrasive since approximately 2002, and asked him if there were any openings at Abrasive. Also in or about that time, Schupp telephoned Abrasive's President, Mike Hanna, and inquired whether Abrasive had a position available in the Buffalo market. Hanna advised Schupp that there was not an opportunity for him at that time. According to Hanna, this was not the first time Schupp had inquired about opportunities at Abrasive. He believes the first inquiry occurred "a year or two prior to November 2009."

In November or December 2009, Schupp was upset with the pricing he was given for a particular customer order, which he believed was outrageous. Around the same time, Schupp had a conversation with IDG employee Bob Cardone, who at one time had been Schupp's supervisor but was demoted to the same position as Schupp. Carbone stated that he was not sure where IDG would be in a year. In or about the end of December 2009, four or five of Schupp's good accounts were take from him and given to another IDG salesperson.

At some time in this November-December time frame, Schupp consulted with an attorney, William Farner. He told Farner he was thinking about leaving IDG, he had a non-compete agreement, and he thought IDG had breached that agreement by reducing his

base salary.

At a holiday gathering in December 2009, Schupp again ran into Dan Gemmer, who suggested that Schupp give Mike Hanna another call.   Schupp did so, and he and Hanna agreed to meet at a Bob Evans restaurant.   Hanna had heard over the years that Schupp was a good salesperson, and was considering creating a new position for him.   At that time, Abrasive had three outside sales persons who were having a difficult time calling on all their assigned accounts, and Hanna believed some customers were not being properly served.   Abrasive did not advertise for the position nor did Hanna interview any other candidates.   Hanna was regularly asked by people within the industry if he was hiring and, when looking for new people, he would draw from that known pool.

During their first meeting, Schupp told Hanna he believed Abrasive's business was growing in the Buffalo market, that IDG was not growing in Buffalo, that Abrasive was doing a good job and was difficult to compete with, and that he would rather work for Abrasive. Schupp also told Hanna he had a non-compete agreement that he believed was unenforceable.   Hanna did not know whether Schupp had discussed the agreement with a lawyer, and told him he needed to do so.

At some point, Schupp told Hanna that he had spoken with an attorney, Farner, and that Farner agreed IDG had breached the agreement by reducing Schupp's salary.   Hanna also spoke with an attorney, Sean Hanna, but attorney-client privilege has been asserted with regard to the substance of those conversations.   Ultimately, Hanna offered Schupp a position with Abrasive as an outside salesperson.   On January 14, 2010, Schupp told Thomas Lewis, the Sales Manager for IDG's Amherst office, that he was resigning his position and going to work for Abrasive.

On January 15, 2010, an attorney wrote to Schupp and Hanna, on behalf of IDG, expressing concerns about potential violations of the NCA, a copy of which was enclosed with the letter.

Schupp began working as an outside sales representative for Abrasive on January 18, 2010, where he is paid on a commission basis and also receives a car allowance.  He does not receive a base salary.  Since beginning work at Abrasive, Schupp has worked out of its Buffalo office—which is less than ten miles away from IDG's Amherst office—and in the Buffalo market.

Hanna was involved in and "okayed" Schupp's account assignments.  Accounts were assigned to Schupp based on a determination that he was the best person for the account which, in turn, was sometimes based on the fact that he had experience with that entity at IDG.  Thereafter, Schupp began soliciting orders from certain entities IDG believes are subject to the NCA,[3] and made contact with the same individuals within those entities that he called on while at IDG.  Of the thirteen entities named by IDG, six had made at least *de minimus* purchases from Abrasive while Schupp was still employed at IDG.  After Schupp began calling on these entities, Abrasive's gross sales revenues from some of the entities increased, and IDG's gross revenues from certain entities decreased.  Hanna did not instruct Schupp that he should not call on particular customers until the Court entered a preliminary injunction against Schupp, on August 18, 2010.  While the injunction was in effect, Schupp continued to call on entities outside of the geographic area covered by the

---

[3] The companies IDG identifies are all those previously listed as having made purchases of $25,000 or more in the 12-month period prior to Schupp's departure, except Accellent Endoscopy and Williams Advanced Materials.

injunction.  Abrasive continued to pay him on a commission basis on sales made to the customers assigned to him, whether inside or outside that geographic area.

**B.      Procedural History**

IDG commenced this action against Schupp on January 29, 2010, and, on February 2, 2010, sought a preliminary injunction.  Schupp filed an answer with counterclaim against IDG.  Thereafter, on March 1, 2010, Schupp moved to dismiss the Complaint.  Schupp's motion to dismiss was denied, and this Court issued a preliminary injunction on August 18, 2010.  An amended order for preliminary injunction issued on May 10, 2011, to, among other things, make clear that the injunction would expire on August 18, 2011.  IDG filed an Amended Complaint on May 12, 2011, adding Abrasive-Tool Corp. as a defendant. Schupp reasserted his counterclaim.

On June 29, 2012, Abrasive moved for summary judgment dismissing all claims against it—*i.e.*, the sixth, seventh and eighth claims for relief.  On that same date, IDG moved for partial summary judgment on its first and second claims against Schupp, alleging breaches of the Non-Compete Agreement, on its sixth and eighth claims against Abrasive, alleging tortious interference and unjust enrichment, and for judgment dismissing Schupp's counterclaim in its entirety.

## III.  DISCUSSION

**A.      The Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A "genuine issue" exists "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202
(1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."
*Id*.

In deciding a motion for summary judgment, the evidence and the inferences drawn
from the evidence must be "viewed in the light most favorable to the party opposing the
motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed.
2d 142 (1970).  But to defeat a motion for summary judgment, a party asserting that a fact
"is genuinely disputed must support the assertion by: [ ] citing to particular parts of
materials in the record, . . . or [ ] showing that the materials cited [by the moving party] do
not establish the absence . . . of a genuine dispute, or that an adverse party cannot
produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  In short, the
non-moving party "must do more than simply show that there is some metaphysical doubt
as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "Only when reasonable minds could not
differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923
F.2d 979, 982 (2d Cir. 1991).

**B.    Analysis**

    **1.    *IDG's Claims against Schupp***

IDG has moved for summary judgment on its first and second causes of action
which claim, respectively, that Schupp breached the NCA's covenant not to compete within
50 miles of IDG's Amherst office (Compl., Ex. A ¶ 7(a)), and the NCA's covenant not to

solicit business from accounts to which he had been assigned and which purchased goods and services of $25,000 or more in the twelve-month period preceding his departure (id. ¶ 7(b)).[4]

To prevail on its claims for breach of contract, IDG must establish: (1) the existence of a contract between itself and Schupp; (2) IDG's performance of its obligations under the contract; (3) that Schupp breached the contract; and (4) that IDG suffered damages that were directly and proximately caused by Schupp's breach.   Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52-53 (2d Cir. 2011).   Schupp urges that material questions of fact exist as to the first, second, and fourth elements.

As to the first element, Schupp contends IDG has not shown that the NCA is an enforceable agreement.   Under New York law, restrictive covenants are enforced only to the extent necessary to protect the employer from unfair competition stemming from the employee's use or disclosure of trade secrets or confidential information, or to protect the employer's good will.   American Inst. Chem. Eng'rs v. Reber-Friel Co., 682 F.2d 382, 387 (2d Cir. 1982).   Schupp maintains questions exist as to whether IDG can show a "legitimate interest" in confidential information or customer "good will" sufficient to support an enforceable agreement.

The issue of IDG's "legitimate interest" in its confidential information is not pertinent to the instant motion.   IDG concedes that questions of fact exist with regard to its claim for breach of the NCA's covenant not to disclose confidential information.   But the NCA includes a severability clause.   (Docket No. 1, Ex. A ¶ 11.)   So, even assuming it were

---

[4] IDG concedes that questions of fact exist as to its Third, Fourth, and Fifth claims against Schupp.

determined the covenant not to disclose is unenforceable, such a conclusion would not render the entire NCA unenforceable.  At issue here is the enforceability of the covenants not to compete and not to solicit, both of which are predicated on IDG's interest in maintaining its client relationships.

The New York State Court of Appeals has determined that employers have "a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense."  BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 392 (1999).  There is no dispute that: Schupp worked for IDG for approximately ten years; IDG assigned him to service its existing accounts and accounts it acquired through the purchase of other entities; IDG provided Schupp a company car and paid for his fuel; it reimbursed Schupp for business development and entertainment expenses in the amounts of $6,937.70 in 2006, $12,159.53 in 2007, $21,087.96 in 2008, and $12,240.98 in 2009; and it occasionally provided him hockey tickets for distribution to clients.  What Schupp does dispute is IDG's characterization of its investment as "substantial," and he contends its expenditures "amounted to nothing more than buying coffee or a sandwich for a customer."

Semantics aside, Schupp does not offer any authority to suggest that there is some formula or threshold IDG has failed to meet in this regard.  Indeed, numerous courts have found a legitimate interest in good will without any assessment of the plaintiff's monetary investment.  Ecolab, Inc. v. K.P. Laundry Mach., Inc., 656 F. Supp. 894, 899 (S.D.N.Y. 1987) (considering "the goodwill of the salesman's relationship with the customer" and noting that such "goodwill can reasonably be viewed as [a] legitimate property interest[ ] of the employer which [is] entitled to contractual protection"); Amer. Inst. Chem. Eng'rs,

682 F.2d at 397 (finding plaintiff had legitimate interest in good will developed through operation of trade show, which defendant, as the "face" of the company for purposes of trade show, was well situated to pirate away); DS Courier Servs., Inc. v. Seebarran, 40 A.D.3d 271, 272 (1st Dep't 2007) (covenant prohibiting defendant from negotiating with certain of plaintiff's customers legitimately protects the goodwill plaintiff had developed with customers). Thus, Schupp's argument that summary judgment must be denied on this basis is rejected.

Schupp's next argument is similar to one made in opposition to IDG's earlier motion for a preliminary injunction. Essentially, Schupp urges that he would not have signed the NCA for just $3,000, the increase in his base salary was part of the consideration IDG offered him to sign, and the NCA was rendered unenforceable when IDG reduced his base salary in March 2009. Based on the record then before it, this Court concluded IDG had shown a likelihood of success on the merits of this claim and granted the preliminary injunction. Schupp now urges that additional evidence and testimony he obtained in discovery raises a triable issue of fact.

According to Schupp, CEO Lingenfelter stated in his deposition that Schupp was "asked and offered to sign a non-compete for consideration of that promotion and $3,000." Schupp's transcript citation is incorrect, and this Court has not found this statement anywhere in the record. IDG contends Schupp has "mischaracterized" this testimony, and that Lingenfelter didn't really know the circumstances under which Schupp signed the NCA. But IDG, which provides record citations for all other arguments, did not do so here and has not explained the purported mischaracterization.

What is known is that Lingenfelter did state, in an earlier affidavit:

13

[O]n or about March 11, 2008, Schupp's supervisor requested that Schupp's position and compensation be changed. A position change from "Account Manager" to "Account Executive" was requested and approved. This change in position and compensation was made retroactive to January 1, 2008.

Pursuant to its procedures, the Personnel Department <u>required</u> Schupp to sign the Non-Compete Agreement. Schupp signed the Agreement on May 27, 2008 and was paid the additional consideration of $3,000 on June 13, 2008, the first bi-monthly pay date after Schupp signed the restrictive covenant.

(Docket No. 24-2 ¶¶ 10-11 (emphasis added).)[5]

Gerber, who approved Schupp's promotion and raise, testified as follows:

Q.     Is it your understand that Mr. Schupp could have refused to sign the non-compete agreement?
A.     Absolutely.
Q.     And there would have been no consequences to that?
A.     No consequences <u>to his current employment</u>.
Q.     Okay. Any consequences?
A.     I don't know.

(Gerber Dep. at 137(emphasis added).)

While there is no indication Schupp would have been terminated had he failed to sign the NCA, these statements, considered in the light most favorable to Schupp, suggest that, had he refused to sign, he may have been denied the raise and promotion. Because Schupp has raised a triable question of fact as to whether his promotion and raise were conditioned on his signing the NCA, such that they could be considered part of the consideration for signing, IDG's motion for summary judgment as to its first and second causes of action is denied.

---

[5] There is no indication as to whether Schupp received his retroactive pay before or after signing the NCA.

2.    ***Schupp's Counterclaim Against IDG***

In answer to IDG's Amended Complaint, Schupp asserted a counterclaim for a declaratory judgment that he has not used or disclosed trade secrets or confidential information, and asserting entitlement, under the bond IDG posted in connection with the preliminary injunction, to an award of lost wages and commissions.  IDG seeks summary judgment dismissing the counterclaim on the grounds that it is entitled to judgment on its first and second causes of action and, alternatively, that Schupp has not suffered any damage compensable under the bond posted pursuant to Federal Rule of Civil Procedure 65(c).  The Court need only address the second ground.

IDG urges, and the record reflects, that Schupp did not lose wages or commissions as a result of the preliminary injunction.  His position at Abrasive does not pay a salary, and he concedes that, during the period of the injunction, he was compensated on a commission basis for all sales made to the accounts he continued to call on and to the accounts he would have called on but for the injunction.  In short, he did not lose commissions.  While Schupp's counterclaim does not expressly seek attorney fees, IDG maintains that such damages would not be recoverable under the bond.

In response, Schupp contends a determination on his counterclaim would be premature and states, in conclusory fashion, that "this lawsuit has clearly caused [me] both extraordinary financial and emotional damage." He identifies the financial harm as consisting of "tens of thousands of dollars in legal fees," without citing any legal support for his position that such fees are recoverable against a bond.

Consistent with th[e] general rule against fee-shifting, it has long been established that a prevailing party may not generally collect as damages against an injunction bond

15

attorneys' fees expended in litigating the injunction.  <u>Nokia Corp. v. Interdigital, Inc.</u>, 645

F.3d 553, 560 (2d Cir. 2011) citations omitted; <u>Chevron Corp. v. Donsiger</u>, 2012 U.S. Dist.

LEXIS 46521, at *8 (S.D.N.Y. Apr. 2, 2012) (attorneys' fees not recoverable on preliminary

injunction bond even where injunction is overturned on appeal); <u>IDG USA, LLC v. Schupp</u>,

2011 U.S. Dist. LEXIS 109399, at *9-10 (W.D.N.Y. Sept. 26, 2011) (citing <u>Nokia</u> and

recognizing well-established rule); <u>Neopost USA, Inc. v. McCabe</u>, 2011 U.S. Dist. LEXIS

105850, *16 (D. Conn. Sept. 19, 2011) (rejecting suggestion that amount of bond should

include projected attorneys fees on ground that fees incurred in litigating injunction are not

recoverable against bond).

At the summary judgment stage, Schupp need not calculate his damages to a

mathematical certainty.  But he must at least show that he has suffered some category of

damages that can support a viable claim.  Because he has not done so here, it is not

premature to conclude that IDG is entitled to summary judgment on Schupp's

counterclaim, to the extent he seeks monetary recovery under the bond.  To the extent

Schupp seeks a declaratory judgment as to his alleged liability for use or disclosure of

confidential information, IDG concedes this is a matter for trial such that a ruling on this

aspect of Schupp's counterclaim would be premature.

### 3.  *IDG's Claims Against Abrasive*

#### a.  <u>Tortious Interference with Contract</u>

To prevail on a claim for tortious interference with contract under New York law, a

"plaintiff must prove: (1) the existence of a valid contract between the plaintiff and a third

party; (2) defendant's knowledge of that contract; (3) that defendant intentionally procured

a breach of that contract; and (4) resulting damages to the plaintiff." <u>Metito (Overseas) Ltd.</u>

v. Gen. Elec. Co., 2009 U.S. Dist. LEXIS 12590, at *20 (S.D.N.Y. Feb. 17, 2009) (citing

White Plaints Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 285 (2d. Cir. 2006)).  IDG

and Abrasive have each moved for summary judgment on this claim.  IDG urges it has

established all elements of its claim as a matter of law, while Abrasive contends it is

entitled to summary judgment because IDG has not, and cannot, establish the third

element.  Because, as set forth above, IDG has not demonstrated the absence of a

material question with regard to the first element, its motion must be denied.

Inasmuch as Abrasive has conceded the first, second, and fourth elements for

purposes of its motion, the Court will consider only whether Abrasive has demonstrated

that it did not intentionally procure Schupp's breach of contract, and there is no material

question in this regard.  "Intentional procurement of a breach is an essential element of the

tort of interference with contractual relations.  A plaintiff must [show] that there would not

have been a breach but for the activities of defendant[ ]."  Omni Consulting Group, Inc. v.

Marina Consulting, Inc., 2011 U.S. Dist. LEXIS 1729, at *10 (W.D.N.Y. Jan. 7, 2011)

(citation omitted) (alterations added) (plaintiff did not establish third element of tortious

interference claim where contracting party came up with idea of breaking agreement and

communicated his intent to defendant, who never suggested or encouraged any

contractual breaches).

IDG first argues that the facts alone require that the Court deny Abrasive's motion.

Essentially, it contends the mere fact of Schupp being employed by Abrasive does not

violate the NCA because the NCA does not prohibit Schupp from obtaining employment

with a competitor, so long as his activities on behalf of the new employer do not violate the

restrictive covenants .  Rather, IDG urges that Abrasive procured the breaches after

17

Schupp commenced employment when it assigned him to engage in substantially similar activities within the prohibited geographic area and to service prohibited customers.

The record does not support IDG's conclusion, nor does it present a material question in this regard. Here, Schupp pursued possible employment at Abrasive in late summer 2009, and again in December 2009.[6]   On both occasions, it was Schupp who contacted Hanna.[7]   In late summer 2009, Schupp called Hanna to inquire specifically about openings in the Buffalo market. In his December meeting with Hanna, Schupp made it clear he was interested in moving to Abrasive because of how well it was doing in the Buffalo market, and that he wanted to call on the same accounts he was calling on at IDG. Even assuming, as IDG contends, that Hanna thought that would be a good idea, there is no evidence that it was Hanna's idea. It was Schupp who stated his desire to remain based in Buffalo, to work in the Buffalo market, and to call on his IDG accounts. Indeed, Schupp stated in his deposition that he had declined to follow up on certain other opportunities he heard of because they were far away or would have required a lot of overnight travel. IDG's suggestion that Schupp accepted employment at Abrasive with no intention of engaging in the conduct complained of, and would not have proceeded to breach the NCA but for Abrasive's post-employment tortious conduct, is without factual support.

IDG next seeks to distinguish the decisions on which Abrasive relies on the ground

---

[6]  Hanna recalls that Schupp first inquired about a position in or before December 2008. Schupp attests that he first began looking for employment after March 2009.

[7]  While it is clear that Gemmer suggested, in December 2009, that Schupp contact Hanna if he was looking to make a change, there is no basis in the record to conclude that he did so at Hanna's direction or that he otherwise was involved in Abrasive's hiring process.

that they involve employees who conducted a more extensive job search than did Schupp, or contracting parties who more clearly exhibited an intention to breach.  *See, e.g.,* Michele Pommier Models v. Men Women N.Y. Model Mgmt., Inc., 173 F.3d 845 (2d Cir. 1999) (affirming dismissal of tortious interference claim against defendant modeling agency where "evidence overwhelmingly demonstrated that [model] intended to break her contract with [plaintiff agency] several months prior to her negotiations with [defendant], and that it was she who sought out [defendant];" and rejecting argument that defendant's cooperation with plaintiff's intentions constituted tort); Metito (Overseas) Ltd. v. GE, 2009 U.S. Dist. Lexis 12590, at *22-23 (S.D.N.Y. Feb. 18, 2009) (no reasonable jury could conclude defendant induced breach where former employee was unhappy working for plaintiff and actively sought out other employment opportunities for two years before applying, unsolicited, to defendant); Cantor Fitzgerald Assocs., L.P. v. Tradition North Am., Inc., 299 A.D.2d 204 (1st Dep't 2002) (affirming dismissal of tortious interference claim where defendant had knowledge of employment contracts, but evidence clearly established that employees were dissatisfied with employment at plaintiff company, were determined to leave that employment, actively sought new employment before any involvement by defendant, and dictated terms they would require in order to work for defendant); Click Model Mgmt., Inc. v. Williams, 167 A.D.2d 279 (1st Dep't 1990) (after model complained about dissatisfaction with current agency, defendant said "You ought to a come over to Ford" and later facilitated phone call on her behalf; court affirmed dismissal of tortious interference claim on ground that such activities were insufficient to raise factual question regarding intentional procurement); Rapp Boxx, Inc. v. MTV, Inc., 226 A.D.2d 324, 325 (1st Dep't 1996) (affirming dismissal of tortious interference claim where evidence showed that

19

contracting party voluntarily repudiated agreement, defendant did not solicit him, and he later independently initiated discussions with defendant).

IDG also cites to one contract case, outside of the employment context, where the court affirmed judgment in favor of the plaintiff on a tortious interference claim. Gold Medal Farms, Inc. v. Rutland County Co-op Creamery, Inc., 9 A.D.2d 473 (3d Dep't 1959).  In this case, Rutland was to supply to Gold Medal all milk that it received and handled in a one-year period.  Rutland's officers were dissatisfied with the contract and discussed breaking it, but took no action in that regard.  Id. at 479.  Approximately four months into the one-year contract period, defendant Vermont Milk and Cream Company made an offer of better terms to Rutland with the intent of persuading it to breach the contract.  Id.  Thereafter, Rutland ceased all milk sales to Gold Medal, though six months remained on the contract.  On these facts, the Appellate Division found "it was permissible for the trier of the facts to draw from the evidence the inference that [defendants]" intentionally induced the breach.  Id. at 479-80.

IDG's attempt to distinguish the facts of this case from those where tortious interference claims were dismissed is unpersuasive.  Although it is clear that Schupp did not engage in as concerted a job search as, say, the employee in Metito, the evidence is uncontroverted that the industry at issue here is quite insular; employees put out "feelers" to others in the industry about possible job opportunities, and Abrasive hires from among known persons in the industry without advertising.  The fact that Schupp's inquiries were informal are not sufficient to suggest inducement by Abrasive.  Indeed, the Court finds this fact situation to be much like Cantor.  On this record, it is undisputed that Schupp was dissatisfied with the pay reduction, customer pricing and other policies or changes IDG

20

implemented, that he sought employment by putting out "feelers," by considering whether or not to follow up on opportunities he heard of, and by repeatedly contacting Abrasive, and that he dictated the terms of employment at Abrasive by making clear that he was interested only in working in the Buffalo area, where he could call on his IDG customers. As for IDG's reliance on Gold Medal, it has not implied, much less shown, that Abrasive's commission-only compensation structure was a "better offer" than IDG's payment of a base salary plus commission. In short, IDG fails to raise a material question sufficient to defeat Abrasive's request for summary judgment.

       b.   Unfair Competition

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (citation and internal quotation marks omitted). "While [t]here is no complete list of the activities which constitute unfair competition, [t]he general principle . . . is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another." Dior v. Milton, 155 N.Y.S.2d 443, 451 (Spec. Term 1956), aff'd, 2 A.D.2d 878 (1st Dep't 1956). New York's law of unfair competition is a "broad and flexible doctrine that depends more upon the facts set forth . . . than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriati(ng) for the commercial

21

advantage of one person . . . a benefit or property right belonging to another." <u>Roy Export Co. Establishment v. CBS, Inc.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982) (internal citations and quotation marks omitted).  It is a settled proposition that "some element of bad faith" is "central" to the notion of unfair competition by misappropriation under New York law. <u>Saratoga Vichy Spring Co., Inc. v. Lehman</u>, 625 F.2d 1037, 1044 (2d Cir. 1980).

Here, Abrasive maintains that summary judgment is appropriate because IDG cannot show that Abrasive acted in bad faith.  IDG does not move for summary judgment on this claim, but does oppose Abrasive's motion.

In moving for relief, Abrasive points to the following undisputed facts: Schupp was dissatisfied with his employment at IDG and put out "feelers" to others in the industry; Schupp made repeated inquiries about employment at Abrasive before Hanna agreed to meet with him; when Schupp told Hanna of, or showed him, the NCA, and stated his belief that the NCA was unenforceable, Hanna told Schupp he needed to speak to an attorney; Hanna hired Schupp only after Schupp reported that he had spoken to an attorney who opined that IDG had breached the NCA's terms, and after Hanna also spoke to an attorney; and Hanna testified that he would not have hired Schupp if he thought the NCA was enforceable.

IDG, in response, urges that Abrasive "displayed some element of bad faith" when, after meeting with Schupp, he did not advertise for or interview any other candidates, hired Schupp despite the existence of the NCA, and then instructed and assigned Schupp to "raid" IDG's customers.[8]  IDG also argues that Schupp had access to confidential

---

[8] As noted above, it was Schupp who requested he be assigned to the same customers he serviced for IDG.

information, which he exploited at Abrasive's instructions.   However, he points to no

evidence supporting the suggestion that Abrasive asked Schupp to disclose, or directed

him to use, confidential information.

Upon consideration of the facts relied on by the parties, and the record as a whole,

the Court finds IDG has not raised a material question as to this central component of bad

faith.  Accordingly, Abrasive's motion for summary judgment dismissing this claim will be

granted.

c.    Unjust Enrichment

To prevail on an unjust enrichment claim in New York, a plaintiff must prove that:

(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience

militate against permitting defendant to retain what plaintiff is seeking to recover.

Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. N.Y. 2004) (citing

Clark v. Daby, 300 A.D.2d 732 (3d Dep't 2002).  "[I]t is the plaintiff's burden to demonstrate

that services were performed *for the defendant* resulting in [the latter's] unjust enrichment,

and the mere fact that the plaintiff's activities bestowed a benefit on the defendant is

insufficient to establish a cause of action for unjust enrichment.  Clark, 300 A.D.2d at 732

(internal citations and quotation marks omitted) (emphasis in original).

Abrasive has moved for summary judgment on this claim on the ground that there

is no connection or relationship between IDG and Abrasive that could have caused reliance

on IDG's part.   IDG also has moved for summary judgment, arguing that Abrasive

benefitted, at IDG's expense, by hiring Schupp and placing him in a position to breach the

NCA.  IDG has not responded to Abrasive's motion, nor has it pursued its own motion in

the face of Abrasive's opposition.  As such, IDG may be deemed to have abandoned its

own motion and to have conceded the appropriateness of dismissal.

Even were that not the case, Abrasive has offered sufficient authority to support dismissal of this claim by Schupp's former employer against its competitor, Schupp's current employer, due to the attenuated connection between them. *See, e.g.*, Barbagallo v. Marcum LLP, 820 F. Supp. 2d 429, 447-48 (E.D.N.Y. 2011) (although defendant received benefits from plaintiff to which it was not entitled after hiring plaintiff's former employee, the benefits were not the result of services plaintiff performed for defendant and connection between plaintiff and defendant was too attenuated to support unjust enrichment claim); Wayne Thomas Salon, Inc. v. Moser, 2010 N.Y. Misc. LEXIS 5015, *12 (Sup. Ct. N.Y. Co. Oct. 12, 2010) (dismissing unjust enrichment claim where defendants reaped benefits, including income from plaintiff's clients, after hiring plaintiff's former employee, because plaintiff did not itself confer any benefit upon defendants which would entitle it to recovery); Zeno Group, Inc. v. Charlotte Wray, 2008 N.Y. Misc. LEXIS 10229, *30 (Sup. Ct. N.Y. Co. Sept. 26, 2008) ("The complaint states that defendants have been unjustly enriched in receiving the benefits of employment and client relationships, 'including that of a special and extraordinary employee who had access to the highly confidential and proprietary information of [plaintiff] . . . . [T]his argument is ineffective. Defendants presumably paid [employee] for her services, and did work in exchange for payment from clients. Nothing was 'bestowed' upon them."). Accordingly, summary judgment in favor of Abrasive is warranted on this claim, as well.

## IV.  CONCLUSION

For the reasons stated, Abrasive's motion is granted in its entirety.  IDG's motion is granted to the extent it seeks summary judgment on that portion of Schupp's counterclaim which seeks compensation under the injunction bond, but is denied in all other respects.

## V.  ORDERS

IT HEREBY IS ORDERED that Defendant Abrasive-Tool Corp.'s Motion for Summary Judgment (Docket No. 111) is GRANTED;

FURTHER that Plaintiff's Motion for Partial Summary Judgment (Docket No. 112) is GRANTED IN PART and DENIED IN PART;

FURTHER that the Clerk of Court shall terminate Abrasive-Tool Corp. as a Defendant in this case.


SO ORDERED.

Dated:      October 21, 2012
             Buffalo, New York


                                         _____/s/William M. Skretny_____
                                              WILLIAM M. SKRETNY
                                                   Chief Judge
                                          United States District Court